UNITED STATES of America, Appellee,

v.

**Joaquin Augusto DIAZ and José Guillermo Guapacha, Defendants–Appellants.**

Nos. 2, 156, Dockets 89–1571, 89–1573.

United States Court of Appeals,
Second Circuit.

Argued Oct. 3, 1990.

Decided Dec. 27, 1990.

Eric Friedberg, Asst. U.S. Atty., Brooklyn, N.Y. (Andrew J. Maloney, U.S. Atty. for the E.D.N.Y., Susan Corkery, Asst. U.S. Atty., Brooklyn, N.Y., on the brief), for appellee.

Henry H. Rossbacher, Los Angeles, Cal. (Harry C. Batchelder, Jr., New York City, Sullivan, Walsh, Rossbacher & Wood, Los Angeles, Cal., on the brief), for defendant-appellant Diaz.

William I. Aronwald, White Plains, N.Y. (Daniel J. Pykett, Aronwald & Pykett, White Plains, N.Y., on the brief), for defendant-appellant Guapacha.

Before FEINBERG, VAN GRAAFEILAND, and KEARSE, Circuit Judges.

KEARSE, Circuit Judge:

Defendants Joaquin Augusto Diaz and José Guillermo Guapacha appeal from final judgments entered in the United States District Court for the Eastern District of New York following a jury trial before I. Leo Glasser, *Judge*, convicting them on one count of conspiracy to transport monetary instruments from New York to Colombia, South America, in furtherance of a narcotics distribution operation, in violation of 18 U.S.C. §§ 371, 1956, and 3551 *et seq.* (1988); and two counts charging money laundering offenses occurring on May 16, 1989, in violation of 18 U.S.C. §§ 1956 and 3551 *et seq.* and § 2 (1988). In addition, Diaz was convicted of two money laundering offenses occurring on May 19, 1989, in violation of 18 U.S.C. §§ 1956, 2, and 3551 *et seq.*; and Guapacha was convicted on one count of conspiracy to possess with intent to distribute more than five kilograms of cocaine, in violation of 21 U.S.C. §§ 846 and 841(b)(1)(A)(ii)(II) (1988). Diaz was sentenced principally to five concurrent 78-month terms of imprisonment, to be followed by a three-year term of supervised release; Guapacha was sentenced principally to four concurrent 188-month terms of imprisonment, to be followed by a five-year term of supervised release. On appeal, defendants contend chiefly that their statutory and constitutional rights were violated when the grand jury that indicted them was selected and empaneled by a magistrate rather than a judge. For the reasons below, we affirm the judgments of conviction.

## I. BACKGROUND

The present prosecution was based largely on the testimony of two government-paid informants, brothers Mario Pena ("Mario") and Hernaldo Pena ("Hernaldo"), and of codefendant Angelica Araya, ringleader of a narcotics operation who testified pursuant to a cooperation agreement. Since there is no challenge to the sufficiency of evidence at trial, a brief summary of that evidence, taken in the light most favorable to the government, will suffice.

In April 1989, Mario and Hernaldo met Araya in Cartagena, Colombia. Araya, engaged in the narcotics trade in New York, enlisted Mario and Hernaldo to assist her

in transporting large amounts of money from New York to Colombia. On May 16, 1989, at Araya's apartment in New York, Araya introduced Mario to Diaz and Guapacha, who worked for her. Diaz and Guapacha went to collect money from elsewhere and, when they returned, helped Mario pack approximately $221,000 into pouches in a T-shirt provided by Araya for that purpose and into his shorts. Araya then drove Mario to the airport.

Mario flew to Miami and reported to the Federal Bureau of Investigation ("FBI"), to which he delivered the money. He attempted to withhold $15,000 as a "commission" but was required to turn over the entire amount.

Araya had made several telephone calls to Mario to inquire whether his brother Hernaldo could supply Araya with cocaine. Eventually it was arranged that Hernaldo would both transport money to Colombia for Araya and sell her 25 kilograms of cocaine. A few days after Mario's receipt of the $221,000, Hernaldo was driven to Araya's apartment by an undercover FBI agent. Araya and Diaz were present, and Hernaldo was given $67,800 to be transported to Colombia. Hernaldo then left the apartment, ostensibly to get the promised cocaine. Diaz left the apartment with him, having been instructed by Araya to get Guapacha so that he and Diaz could deal with the expected cocaine delivery. Hernaldo and Diaz were seen on the street in front of Araya's apartment by FBI agents conducting surveillance. When Diaz returned with Guapacha, they were placed under arrest.

Diaz, Guapacha, and Araya were indicted in a six-count indictment. The indictment charged each of them with one count of conspiracy to possess with intent to distribute more than five kilograms of cocaine, in violation of 21 U.S.C. §§ 846 and 841(b)-(1)(A)(ii)(II) (count 1); one count of conspiracy to transport monetary instruments from New York to Colombia, in furtherance of a narcotics distribution operation, in violation of 18 U.S.C. §§ 371, 1956, and 3551 *et seq.* (count 2); two money laundering offenses on May 16, 1989, in violation of 18 U.S.C. §§ 1956, 2, and 3551 *et seq.* (counts 3 and 4); and two money laundering offenses on May 19, 1989, in violation of 18 U.S.C. §§ 1956, 2, and 3551 *et seq.* (counts 5 and 6).

Prior to trial, defendants moved to dismiss the indictment on the grounds (1) that in violation of their constitutional and statutory rights, the grand jury voir dire had been conducted, and the grand jury empaneled, by a United States Magistrate rather than a United States District Judge, and (2) that much of the evidence presented to the grand jury was hearsay and that body might not have been advised of its right to demand non-hearsay information. The court concluded that designation of magistrates to conduct grand jury proceedings was permissible; it reviewed the grand jury minutes and found no impropriety. Accordingly, both motions were denied.

Araya pleaded guilty four days before trial and testified as a government witness. The jury acquitted Diaz on count 1 and found him guilty on counts 2–6. It acquitted Guapacha on counts 5 and 6 and found him guilty on the other four counts. Defendants were sentenced as indicated above, and these appeals followed.

## II. DISCUSSION

On appeal, defendants contend principally (1) that they are entitled to the dismissal of the indictment because (a) the selection and empaneling of the grand jury by a magistrate rather than by a judge violated their rights under the federal statute governing jury selection, and (b) the grand jury was not properly informed of the hearsay nature of the testimony before it; and (2) that the district court erred in not granting them a new trial on the basis of newly discovered evidence. In addition, Diaz contends that the government unfairly delayed in disclosing *Brady* material to him and that he was prejudiced by trial testimony involving a threat made by Guapacha. Finding no merit to any of defendants' contentions, we affirm the judgments of conviction.

## A. *Grand Jury Issues*

### 1. *Selection of the Grand Jury By a Magistrate*

■ Jury selection in the federal courts is governed generally by the Jury Selection and Service Act, 28 U.S.C. §§ 1861–1878 (1988) ("Jury Act"). Section 1865(a) provides, in pertinent part, that the determination of the qualifications of prospective jurors shall be made by "[t]he chief judge of the district court, or such other district court judge as the [district's jury selection] plan may provide...." 28 U.S.C. § 1865(a). The terms of the Jury Act draw no distinction between potential petit jurors and potential grand jurors. Despite the apparent applicability of § 1865(a), we reject defendant's challenge to grand jury selection by a magistrate rather than a district court judge because we conclude that the apparent limitation in the Jury Act is overridden by 28 U.S.C. § 636(b)(1)(A), which is part of the Federal Magistrates Act, Pub.L. No. 90–578, 82 Stat. 1107 (1968) (codified as amended in scattered sections of the United States Code, including 28 U.S.C. §§ 631–639 (1988)) (collectively "Magistrates Act").

■ The Magistrates Act authorizes district judges, in pertinent part, to delegate "any pretrial matter" to a federal magistrate, notwithstanding any apparently conflicting statute. Thus, § 636(b)(1)(A) provides as follows:

(b)(1) *Notwithstanding any provision of law to the contrary* —

(A) a judge may designate a magistrate to hear and determine *any pretrial matter* pending before the court, except a motion for injunctive relief, for judgment on the pleadings, for summary judgment, to dismiss or quash an indictment or information made by the defendant, to suppress evidence in a criminal case, to dismiss or to permit maintenance of a class action, to dismiss for failure to state a claim upon which relief can be granted, and to involuntarily dismiss an action. A judge of the court may reconsider any pretrial matter under this subparagraph (A) where it has been shown

that the magistrate's order is clearly erroneous or contrary to law.

28 U.S.C. § 636(b)(1)(A) (emphasis added). The selection and empaneling of a grand jury are not among the tasks expressly excluded from this authorization, and they plainly occur prior to any part of the trial. On its face, therefore, § 636(b)(1)(A) appears to authorize delegation of the pretrial functions of grand jury selection and empaneling to a magistrate.

Defendants contend that the Supreme Court's recent decision in *Gomez v. United States*, 490 U.S. 858, 109 S.Ct. 2237, 104 L.Ed.2d 923 (1989), requires the opposite conclusion. In *Gomez*, over the objection of the defendants, a magistrate had conducted the selection, voir dire, and preliminary instruction of a petit jury. The Supreme Court ruled that the designation of the magistrate to perform these functions was not authorized by the Magistrates Act. In reaching this conclusion, the Court viewed the selection of the petit jury as the first significant step in the trial and rejected the proposition that petit jury selection could be deemed either a "pretrial matter" within the meaning of § 636(b)(1)(A) or a task covered by the catchall provision of § 636(b)(3), which provides that "[a] magistrate may be assigned such additional duties as are not inconsistent with the Constitution and laws of the United States," 28 U.S.C. § 636(b)(3).

Though recognizing that a trial does not commence for purposes of the Double Jeopardy Clause until the empaneled jury is sworn, 109 S.Ct. at 2246; *see Serfass v. United States*, 420 U.S. 377, 388, 95 S.Ct. 1055, 1062, 43 L.Ed.2d 265 (1975), the *Gomez* Court noted that in the Federal Rules of Criminal Procedure, the Rules pertaining to jury selection have been placed in the chapter entitled "Trial," and it observed that petit jury selection is a crucial phase in the protection of the right of the accused to a fair trial. The Court pointed out that the voir dire process "represents jurors' first introduction to the substantive factual and legal issues in a case," *id.* 109 S.Ct. at 2247, and that "[j]ury selection is the primary means by which a court may

enforce a defendant's right to be tried by a jury free from ethnic, racial, or political prejudice, ... or predisposition about the defendant's culpability," *id.* at 2246.

The *Gomez* Court noted that the decisions of the presiding official as to who is to serve on the petit jury are dispositive and, "[l]ike motions to suppress evidence, petitions for writs of habeas corpus, and other dispositive matters entailing evidentiary hearings, jury selection requires the adjudicator to observe witnesses, make credibility determinations, and weigh contradictory evidence." *Id.* at 2246 n. 27. Further, decisions as to petit jury selection are difficult to subject to meaningful review in a way that does not prejudice the rights of the defendant.

> To detect prejudices, the examiner ... must elicit from prospective jurors candid answers about intimate details of their lives. The court further must scrutinize not only spoken words but also gestures and attitudes of all participants to ensure the jury's impartiality.... But only words can be preserved for review; no transcript can recapture the atmosphere of the *voir dire*, which may persist throughout the trial.

*Id.* at 2247. Any attempt at a thorough review of this process by the district judge, entailing individual questioning of the seated jurors before or during trial, would risk placing them on the defensive and prejudicing them in other ways. *Id.* at 2247 n. 29.

In sum, influenced principally by the factors that the petit jury selection process represents the jurors' first education as to the nature of the case they will adjudicate, that the decisions of the presiding official are dispositive of one facet of the accused's jury trial rights, and that *de novo* review of those decisions is virtually impossible, the Supreme Court concluded that Congress did not intend the Magistrates Act to authorize delegation of petit jury selection to magistrates.

The selection of grand juries was not at issue in *Gomez,* and we view the factors highlighted by the *Gomez* Court as largely inapplicable in the context of grand jury selection. To be sure, both processes share some characteristics. As in the case of petit jurors, some prospective grand jurors will seek to be excused from serving; the credibility of their excuses must be evaluated and weighed against the institutional interest in participation by a cross-section of the community. *See generally* M. Frankel & G. Naftalis, *The Grand Jury, An Institution on Trial* 44–45 (1977). And a transcript, if one is made, will be able to record only words, not gestures or atmosphere. Yet in more important respects, grand jury selection is significantly different from selection of the petit jury.

First, the selection proceedings are different, largely because, except in the case of some special grand juries, *see* 18 U.S.C. § 3331 *et seq.* (1988), the grand jury selection process does not focus on any particular case. Thus, though prospective grand jurors, like prospective petit jurors, may ask to be excused for reasons of personal hardship, the presiding official generally is not asked to rule on challenges to individual jurors or on case-specific conflicts. Further, the effort to assure the impartiality of the grand jurors normally occurs not through the questioning of individual prospective jurors, but through delivery of a description of the history and functions of the grand jury, an overview of its duties, an admonition as to the confidentiality of its proceedings, and a reminder of its responsibilities, including the importance both of apprehending the guilty and of protecting the innocent. *See generally* M. Frankel & G. Naftalis, *The Grand Jury, An Institution on Trial* at 47.

Indeed, the actual empanelment of the grand jury is essentially a nonsubstantive, fairly ministerial task. The process in the federal district courts is officially described as follows:

> When the prospective grand jurors convene in the courtroom, the judge advises them briefly why they are present and introduces the government's counsel who may be in attendance. An opportunity should be given to those individuals on the panel who want to request to be excused from service.

Thereafter the judge directs the clerk to select 23 of their number by lot. The judge then designates a foreperson and a deputy foreperson. The judge should advise the jurors of the prospective term of their service. All proceedings during which a witness is present shall be recorded stenographically or by an electronic recording device.

Thereupon, the grand jurors are sworn, and the judge proceeds with his instructions.

United States Judicial Conference Committee on the Operation of the Jury System, *Handbook for Federal Grand Jurors* at 19 (1980) (*"Official Grand Jury Handbook"*).

The *Official Grand Jury Handbook* provides a standard set of instructions to be delivered by the presiding official after the grand jury is empaneled and sworn. These instructions do not introduce the jurors to the substantive factual and legal issues in a case, for the grand jury normally is empaneled to serve for a period of 18 months, and at the time of selection its attention generally is not focused on any one case. Rather, the principal thrust of the instructions is to educate the newly sworn grand jurors as to, *inter alia,* proper procedures, the role of the prosecutor, the nature of probable cause, and the fact that their role is not to concern themselves with determining a suspect's guilt beyond a reasonable doubt but merely to make accusations based on probable cause. *See id.* at 19–36.

In light of the grand jury's role and the fairly routine nature of the task of selection, empaneling, and instructing the grand jury, we view the legislative history of § 636(b)(1)(A) as indicating that this is a task whose delegation to magistrates Congress intended to authorize. The overarching goal of the Magistrates Act, which was first enacted in 1968, is to allow magistrates to perform some of the tasks ordinarily performed by judges, thereby allowing judges to devote more of their time to dispositive adjudication. *See* H.R.Rep. No. 90–1629, *reprinted in* 1968 U.S.Code Cong. & Admin.News ("USCCAN") 4252, 4254–55. The present version of § 636(b)(1)(A) was enacted in 1976 as an amendment to

the original statute. The legislative history of the amendment stated that § 636(b)(1)(A) was intended to authorize magistrates to handle, *inter alia,* "a great variety of preliminary motions and matters which can arise in the preliminary processing of ... a criminal ... case," H.R.Rep. No. 94–1609 ("House Report"), at 9, *reprinted in* 1976 USCCAN 6162, 6169, and it noted that, under similar existing provisions, magistrates were already authorized to perform many functions of the type to be authorized by § 636(b)(1)(A). As one example, the House Report noted that magistrates were already conducting preliminary examinations of persons accused of crimes. House Report at 7, 9, *reprinted in* 1976 USCCAN at 6167, 6169; *see also* Federal Magistrates Act, Pub.L. No. 90–578, § 303(a), 82 Stat. 1117 (1968) (codified as amended at 18 U.S.C. § 3060 (1988)). At such a preliminary examination, which is generally required in a case where no indictment or information has been filed, the magistrate determines whether there is probable cause to believe the accused has committed the crime charged. *See* Fed.R. Crim.P. 5(c), 5.1. In light of Congress's prior approval of magistrates' making these probable cause determinations, we hardly think it likely that Congress meant to withhold authorization for magistrates to perform the lesser task of empaneling the grand jurors who are to make probable cause determinations in other cases.

We also regard *de novo* review of grand jury selection as presenting far fewer difficulties than would the review of petit jury selection. Since the grand jury is not involved in any phase of the trial, review by a district judge of the grand jury selection process would pose no threat to the fairness of the ensuing trial. The task of the grand jurors would have been concluded; no inquiry need be made of persons who would sit on the petit jury; and inquiries of the grand jurors would be unknown to the petit jurors. Hence, *de novo* review of the grand jury selection process could not infect the trial.

■ The availability of *de novo* review of the grand jury proceedings prior to and

without prejudice to the eventual trial proceedings also suffices to safeguard a defendant's right against any unconstitutional delegation of Article III power. *Cf. United States v. Raddatz*, 447 U.S. 667, 100 S.Ct. 2406, 65 L.Ed.2d 424 (1980) (since ultimate authority to decide pretrial motions remains with the district court, the Magistrates Act's authorization to delegate initial determination of such motions does not violate Article III).

In sum, we are persuaded by the nature of the grand jury selection process, the role of the grand jury in the judicial process, and the other types of proceedings whose conduct by magistrates Congress plainly approved, that "pretrial matters" in § 636(b)(1)(A) was intended to include selection and empaneling of grand jurors among the functions that could properly be delegated to a magistrate. And we are persuaded that, because adequate review is available from an Article III judge, that delegation does not violate a defendant's constitutional rights.

■ Finally, even if delegation of grand jury empanelment to a magistrate is not authorized by the Act, there is no basis in the present case for dismissal of the indictment. Nonconstitutional error does not warrant such a dismissal unless " 'it is established that the violation substantially influenced the grand jury's decision to indict,' or [unless] there is 'grave doubt' that the decision to indict was free from the substantial influence of such violations." *Bank of Nova Scotia v. United States*, 487 U.S. 250, 256, 108 S.Ct. 2369, 2374, 101 L.Ed.2d 228 (1988) (quoting *United States v. Mechanik*, 475 U.S. 66, 78, 106 S.Ct. 938, 945–46, 89 L.Ed.2d 50 (1986) (O'Connor, *J.*, concurring)). In this case defendants made no showing that the delegation of grand juror empanelment to a magistrate in any way prejudiced them. We conclude that if the delegation was error, the error was harmless.

### 2. *The Availability of Review By a Judge*

■ Defendants argue that even if designation of a magistrate to oversee grand jury selection is permissible in principle, they are entitled to a dismissal of the indictment in this case because there was no transcription or recording of the grand jury selection proceedings. Thus, defendants argue that no meaningful review was possible by the district court, and the delegation in this instance was improper. We disagree.

■ While *de novo* review of the proceedings would plainly be facilitated if all phases of the proceedings were recorded, the absence of such a recording does not mean that no adequate review can be conducted. Courts frequently must reconstruct events when there has been no recordation of the proceedings under review. *See generally* 7-Pt.2 *Moore's Federal Practice* ¶ 72.04[10.–2], at 72–68 (The Nature of De Novo Review) (2d ed. 1990). The lack of a transcript, while making review more difficult, was not a dispositive impediment and did not invalidate the procedure followed here.

We would suggest, however, that the district courts take precautions to facilitate appropriate review. Such precautions might consist, at a minimum, of requiring the magistrate to certify that he or she has followed the practices approved by the United States Judicial Conference and published in the *Official Grand Jury Handbook*, and might sensibly extend to having the selection and empanelment proceedings electronically recorded.

### 3. *The Presentation of Hearsay Evidence*

■ Defendants also request dismissal of the indictment on the ground that the grand jury was misled into believing that the single witness before it had direct knowledge of the events described in his testimony. We find no basis for reversal.

As we noted in *United States v. Dyman*, 739 F.2d 762 (2d Cir.1984), *cert. denied*, 469 U.S. 1193, 105 S.Ct. 969, 83 L.Ed.2d 973 (1985),

[t]he use of hearsay testimony before a grand jury raises questions about the validity of an indictment only when the

prosecutor misleads the grand jury into thinking it is getting first-hand testimony when it really is receiving hearsay, ... or where there is a high probability that if eyewitness rather than hearsay testimony had been used, the defendant would not have been indicted.

*Id.* at 767; *see also United States v. Brito,* 907 F.2d 392, 394 (2d Cir.1990); *United States v. Estepa,* 471 F.2d 1132, 1137 (2d Cir.1972). We have reviewed the grand jury transcript in the present case and find no impropriety. Though most of the evidence presented to the grand jurors was hearsay, the prosecutor so informed them and advised that they could call first-hand witnesses if they wished.

■ Further, in light of the testimony given by Mario and Hernaldo at trial, we see no likelihood that if the grand jury had been presented with their first-hand testimony it would have failed to indict. The petit jury, hearing that testimony, found defendants guilty of most of the charges against them beyond a reasonable doubt. We conclude that any error at the grand jury stage, resulting in the finding of probable cause, must be deemed harmless. *See, e.g., United States v. Mechanik,* 475 U.S. at 72–73, 106 S.Ct. at 942–943.

### B. *Other Issues*

■ Defendants raise several other issues unrelated to the grand jury proceedings. They are without merit.

### 1. *The Newly Discovered Evidence*

Shortly after the end of trial, the government learned that Mario Pena, employed by the government as a full-time informant, had stolen approximately $18,000 from the government during his work in another case. Upon being informed of this fact, defendants moved for a new trial pursuant to Fed.R.Crim.P. 33, contending that the government had known of Pena's theft before the end of the trial, that its failure to make that disclosure during trial violated their rights under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and that they were entitled to a new

trial at which they could use the new information to impeach Mario's testimony.

In a Memorandum and Order dated April 26, 1990, the district court denied the motion. It found that, though the government may have had suspicions, it did not have knowledge that Mario had stolen the $18,000 until after the trial had concluded. The court noted, relying on *United States v. Agurs,* 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976), and *Giles v. Maryland,* 386 U.S. 66, 87 S.Ct. 793, 17 L.Ed.2d 737 (1967), that the government has no *Brady* obligation to " 'communicate preliminary, challenged, or speculative information,' " *United States v. Agurs,* 427 U.S. at 109 n. 16, 96 S.Ct. at 2400 n. 16 (quoting *Giles v. Maryland,* 386 U.S. at 98, 87 S.Ct. at 809 (Fortas, *J.,* concurring)), and concluded that there therefore had been no *Brady* violation here. The court also concluded that the new evidence did not warrant a new trial because it would merely be repetitive of the large amount of evidence already presented to impeach Mario's testimony. We find no error in these rulings.

■ A motion for a new trial on the ground of newly discovered evidence is committed to the court's sound discretion. *See, e.g., United States v. Parker,* 903 F.2d 91, 103 (2d Cir.), *cert. denied,* —— U.S. ——, 111 S.Ct. 196, 112 L.Ed.2d 158 (1990). Such relief is merited only if, *inter alia,* the evidence is "such that it would probably lead to an acquittal," *United States v. Gilbert,* 668 F.2d 94, 96 (2d Cir.1981), *cert. denied,* 456 U.S. 946, 102 S.Ct. 2014, 72 L.Ed.2d 469 (1982), and would create "a reasonable doubt that did not otherwise exist," *United States v. Agurs,* 427 U.S. at 112, 96 S.Ct. at 2401–02; *see also United States v. Alessi,* 638 F.2d 466, 479 (2d Cir.1980); *United States v. Stofsky,* 527 F.2d 237, 243 (2d Cir.1975), *cert. denied,* 429 U.S. 819, 97 S.Ct. 65, 50 L.Ed.2d 80 (1976); *United States v. Rosner,* 516 F.2d 269, 272 (2d Cir.1975), *cert. denied,* 427 U.S. 911, 96 S.Ct. 3198, 49 L.Ed.2d 1203 (1976). The district court's findings of fact in connection with such a motion will not be overturned on appeal unless they are clearly erroneous, *see id.* at 272–73, and we will

not reverse the denial of the motion unless there has been an abuse of discretion, *see, e.g., United States v. Parker,* 903 F.2d at 103. We find no such error or abuse of discretion here.

The record does not indicate that the court's finding as to the timing of the government's knowledge was clearly erroneous. The record does support the court's conclusion that the attack on Mario's credibility would have been somewhat redundant since his credibility had in fact been attacked repeatedly. In particular, defendants had pointed out Mario's expectation of financial gain for obtaining evidence and testifying against these defendants and his attempt to withhold $15,000 in this case. The new evidence was unlikely to lead to a different result. The district court plainly did not abuse its discretion in denying the motion for a new trial.

### 2. *Diaz's* Brady *Claim*

■ Araya testified at trial that Diaz was not in her apartment during the May 16, 1989 transaction with Mario. Diaz did not learn that she would so testify until the trial, and he contends that the nondisclosure of this fact by the government breached its obligation under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, to inform him of Araya's planned testimony sooner and that he was thus entitled to a mistrial. His argument is frivolous.

First, there is no improper suppression within the meaning of *Brady* where the facts are already known by the defendant.

> Evidence is not "suppressed" if the defendant either knew, *see, e.g., United States v. Robinson,* 560 F.2d 507, 518 (2d Cir.1977), *cert. denied,* 435 U.S. 905, 98 S.Ct. 1451, 55 L.Ed.2d 496 (1978), or should have known, *see, e.g., United States v. Brown,* 582 F.2d 197, 200 (2d Cir.), *cert. denied,* 439 U.S. 915, 99 S.Ct. 289, 58 L.Ed.2d 262 (1978), of the essential facts permitting him to take advantage of any exculpatory evidence.

*United States v. LeRoy,* 687 F.2d 610, 618 (2d Cir.1982), *cert. denied,* 459 U.S. 1174, 103 S.Ct. 823, 74 L.Ed.2d 1019 (1983). If in fact, as Araya testified, Diaz was not in her apartment during the May 16 transaction with Mario, Diaz knew that fact. Hence, the failure of the government to advise him in advance that she would so testify was not a *Brady* violation.

■ Moreover, even where there has been a *Brady* violation, a defendant is not entitled to reversal unless he can show that the delayed disclosure caused him prejudice. *United States v. Brown,* 582 F.2d 197, 200 (2d Cir.), *cert. denied,* 439 U.S. 915, 99 S.Ct. 289, 58 L.Ed.2d 262 (1978). Diaz has failed to make such a showing here. He plainly had Araya's testimony available for use in summation. Further, though Diaz argues that since Mario testified before Araya he was unable to cross-examine Mario about Araya's conflicting testimony, he did not seek to recall Mario to the witness stand. The district court offered to allow him to recall Mario for that purpose; Diaz ignored the offer. He cannot now be heard to complain.

### 3. *The Threatening Gestures*

■ During both the cross-examination of Araya by Guapacha and the redirect examination of her by the government, Araya testified that when she and Guapacha met in the prison where they were being held during trial, Guapacha and his attorney made threatening gestures toward her by drawing a finger across the throat. Diaz did not object to the questions that elicited this testimony, but he thereafter asked the district court to instruct the jury "that this has nothing to do with Diaz." Diaz now objects that the district court's refusal to so instruct the jury subjected him to prejudicial spillover and that the gestures "injected violence into the trial." We find no error.

■ Given the fact that the testimony did not link Diaz to the threats and that Diaz did not object when the threats were brought up either on cross-examination by Guapacha or on redirect by the government, the court did not abuse its discretion in declining to give the requested instruction. Further, the verdicts belie any notion that there was prejudicial spillover, as the

jury acquitted Diaz on one of the counts on which it convicted Guapacha.

## CONCLUSION

We have considered all of defendants' contentions on these appeals and have found in them no basis for reversal. The judgments of conviction are affirmed.