784 F.Supp. 1019 (1992)
In re Applications of UNITED STATES ATTORNEY FOR ORDERS PURSUANT TO TITLE III OF THE OMNIBUS CRIME CONTROL AND SAFE STREETS ACT OF 1968.
Misc. No. 92-43.
United States District Court, E.D. New York.
February 14, 1992.
*1020 Andrew J. Maloney, U.S. Atty., E.D.N.Y., Brooklyn, N.Y., for applicant.

MEMORANDUM AND ORDER
KORMAN, District Judge.
Pursuant to an administrative order of Chief Judge Platt, I am serving in the Miscellaneous Part from February 10, 1992 to February 23, 1992. One of the duties of the judge assigned to the Miscellaneous Part is the review of applications for electronic eavesdropping orders pursuant to Title III of the Omnibus Crime Control and Safe Streets Act of 1968 ("Title III"), 18 U.S.C. §§ 2510-21 (1988). Because it is my intention to refer such applications to a United States magistrate judge, I address here the issue whether the referral of a Title III application to a United States magistrate judge is authorized by the Federal Magistrates Act.

DISCUSSION
The Federal Magistrates Act of 1968, Pub.L. No. 90-578, 82 Stat. 1107, codified as amended at 18 U.S.C. §§ 3401-3402; 28 U.S.C. §§ 631-39 (1988 & Supp. I 1989), abolished the office of United States commissioner and replaced it with a judicial officer serving directly below the level of the district court. Congress imposed significant requirements to ensure the competency and impartiality of these judicial officers and it gave them significantlyindeed, dramaticallymore responsibility than it had previously conferred on United States commissioners.
Congress conferred on magistrates not only all powers formerly exercised by commissioners, it also conferred on magistrates the power to try minor offenses when all parties consent, and to perform such additional duties assigned by the district court as are "not inconsistent with the Constitution and laws of the United States." Federal Magistrates Act of 1968 § 636(b), Pub.L. No. 90-578, 82 Stat. 1108, 1113 (1968). The "additional duties" could include, but were not restricted to
(1) service as a special master in an appropriate civil action, pursuant to the applicable provisions of this title and the Federal Rules of Civil Procedure for the United States district courts;
(2) assistance to a district judge in the conduct of pretrial or discovery proceedings in civil or criminal actions; and
(3) preliminary review of applications for post-trial relief made by individuals convicted of criminal offenses, and submission of a report and recommendations to facilitate the decision of the district judge having jurisdiction over the case as to whether there should be a hearing.
Id.
The experience under former section 636(b) demonstrated that magistrates were fulfilling their intended function of assisting "the district judge to the end that the district court judge could have more time to preside at the trial of cases." H.R.Rep. No. 1609, 94th Cong., 2nd Sess. 6 (1976), reprinted in 1976 U.S.C.C.A.N. 6162, 6166. Congress was disturbed, however, by a series of cases that construed former section 636 in a manner that limited the "additional duties" that could be conferred on magistrates. See e.g. Wingo v. Wedding, 418 U.S. 461, 94 S.Ct. 2842, 41 L.Ed.2d 879 (1974); T.P.O. v. McMillen, 460 F.2d 348 (7th Cir.1972); Ingram v. Richardson, 471 *1021 F.2d 1268 (6th Cir.1972). Accordingly, former section 636(b) was rewritten in 1976 to restate and clarify "the Congressional intention that the magistrate should be a judicial officer who, not only in his own right but also under general supervision of the court, shall serve as an officer of the court in disposing of minor and petty criminal offenses, in the preliminary or pretrial processing of both criminal and civil cases, and in hearing dispositive motions and evidentiary hearings when assigned to the magistrate by a judge of the court." H.R.Rep. No. 1609, 94th Cong., 2d Sess. 5 (1976), reprinted in 1976 U.S.Code Cong. & Admin.News 6162, 6165.
There are two clauses of the revised section 636(b) that are particularly relevant to the issue whether an application for an eavesdropping order may be referred to a United States magistrate judge: The "pretrial matters" clause and the "additional duties" clause. An analysis of the language and legislative history of these two clauses, which were enacted after the Omnibus Crime Control and Safe Streets Act of 1968, provides compelling support for referral of these applications to a United States magistrate judge.

A. The "Pretrial Matters" Clause

The "pretrial matters" clause of the Federal Magistrates Act provides that, "[n]otwithstanding any provision of law to the contrary ... any pretrial matter pending before the court," except for certain dispositive motions, may be referred to a United States magistrate judge. 28 U.S.C. § 636(b)(1)(A). Because this clause is applicable to ex parte proceedings that take place prior to the commencement of a criminal case, United States v. Diaz, 922 F.2d 998 (2d Cir.1990), the principal objection to the referral of an application for a Title III order to a United States magistrate judge derives from the fact that these judicial officers are not among the judges of competent jurisdiction in whom Congress explicitly vested the authority to issue such orders  namely, judges of the United States district courts and the courts of appeals.[1] 18 U.S.C. §§ 2510(9)(a) and 2516(1).
Of some relevance to this objection is United States v. Giordano, 416 U.S. 505, 94 S.Ct. 1820, 40 L.Ed.2d 341 (1974). There at issue was 18 U.S.C. § 2516(1), as originally enacted, which empowered the "Attorney General or any Assistant Attorney General specially designated by the Attorney General" to "authorize an application to a federal judge of competent jurisdiction for an order authorizing or approving the interception of wire or oral communications" by federal investigative agencies. Omnibus Crime Control and Safe Streets Act of 1968 § 2516(1), Pub.L. No. 90-351, 82 Stat. 197, 216 (1968).[2] Relying on 28 U.S.C. § 510, which authorized the delegation of "any function of the Attorney General" to "any other officer" or "employee" of the Department of Justice, the Solicitor General argued that the power to authorize a Title III application could be delegated by the Attorney General to a subordinate other than an Assistant Attorney General. In rejecting this argument, the Supreme Court wrote:
Despite § 510, Congress does not always contemplate that the duties assigned to the Attorney General may be freely delegated. Under the Civil Rights Act of 1968, for instance, certain prosecutions are authorized only on the certification of the Attorney General or the Deputy Attorney General, "which function of certification *1022 may not be delegated." 18 U.S.C. § 245(a)(1). Equally precise language forbidding delegation was not employed in the legislation before us; but we think § 2516(1), fairly read, was intended to limit the power to authorize wiretap applications to the Attorney General himself and to any Assistant Attorney General he might designate. This interpretation of the statute is also strongly supported by its purpose and legislative history.
416 U.S. at 514, 94 S.Ct. at 1826.
The conclusion the Supreme Court reached in Giordano could arguably apply to the question whether the authority to issue eavesdropping orders, which Title III vests in judges of the United States District Court and the United States Court of Appeals, may be delegated to United States magistrate judges. Such an extension of the holding in Giordano, however, could not be reconciled with two critical aspects of the Federal Magistrates Act. Unlike 28 U.S.C. § 510, the Federal Magistrates Act was adopted after the enactment of Title III and it contains a clause that permits the delegation of specified authority vested in district court judges notwithstanding any existing law to the contrary. More significantly, a careful analysis of the legislative history demonstrates that the failure of Congress to include United States magistrate judges among the judges authorized to issue Title III orders does not provide a sufficient basis for inferring that Congress intended to preclude the delegation of that responsibility pursuant to the subsequently enacted Federal Magistrates Act.
The Organized Crime Control and Safe Streets Act of 1968 and the Federal Magistrates Act of 1968 were enacted by the 90th Congress. A common thread running through both is the finding of Congress that defects in the commissioner system had undermined the competence, integrity and professionalism of the United States commissioners. Commissioners were paid under a fee system according to the number and nature of the matters they handled; many served only on a part-time basis; one third of commissioners were non-lawyers; most commissioners were required to use their own resources to meet the expenses of their office; commissioners received little guidance in performing their duties; and commissioners were grossly underpaid and were subject to removal without cause, making it difficult to attract qualified applicants. H.R.Rep. No. 1629, 90th Cong., 2d Sess. (1968), reprinted in 1968 U.S.C.C.A.N. 4252, 4255-56; McCabe, The Federal Magistrates Act of 1979, 16 Harv.J.Legis. 343, 347 (1979).
The sorry state of the commissioner system was summed up by Senator Tydings during the course of the debates leading to the passage of the Federal Magistrates Act:
One's first impression, Mr. President, is that it is certainly less than a happy situation that a person who has not been admitted to the barand who therefore, has no trial experience, and probably little if any familiarity with the Federal Rules of Criminal Procedure or with the rules of evidenceshould be permitted to discharge responsibilities that call for the exercise of trained legal judgment. The decisions that commissioners must routinely make often involve some of the most difficult points of constitutional law, which the best lawyers and judges are hard pressed to apply correctly.
Senator Tydings continued that, when reviewing an application for a search or arrest warrant, "a U.S. commissioner may be the only judicial officer in a position to insure that individual rights are not disregarded by overzealous prosecutors. Yet ... it appears in many instances the action of the Commissioner may be little more than a rubber stamp of the application of the complaining officer."[3] Subsequently, testimony taken by the Senate Judiciary Subcommittee on Improvements in Judicial Machinery established that "[i]n many districts *1023 search warrants and arrest warrants are handled on a mass production basis with no independent judicial determination being made as to whether probable cause exists for the issuance of a warrant." Memorandum Prepared by the Staff of the Subcomm. on Improvements in Judicial Machinery, April 28, 1966, reprinted in 1966-67 Senate Hearings at 9.
The Omnibus Crime Control and Safe Streets Act addressed this problem by specifically providing that "a judge of the United States district court or a United States court of appeals" could entertain applications for Title III orders made by federal law enforcement officers. In explaining this clause, the Senate Judiciary Committee observed that, although "existing practice permitted United States Commissioners and city mayors to issue search warrants," that practice was "too permissive for the interception of wire or oral communications." S.Rep. No. 1097, 90th Cong., 2d Sess. (1968), reprinted in 1968 U.S.C.C.A.N. 2112, 2179. The Federal Magistrates Act, which was enacted shortly thereafter, addressed the problem more directly by abolishing the office of United States commissioner and creating the office of United States magistrate. Echoing the sentiments voiced in the legislative history of Title III, the House Judiciary Committee explained that one of its primary concerns was that "[c]ommissioners in many districts grant[ed] search and arrest warrant applications perfunctorily, thereby depriving both the accused and the legal system of an independent determination of the question of probable cause." H.R.Rep. No. 1629, 90th Cong., 2d Sess. (1968), reprinted in 1968 U.S.C.C.A.N. 4252, 4256.
To rectify this problem, Congress created the office of United States magistrate, thereby increasing "the overall efficiency of the federal judiciary while at the same time providing a higher standard of justice at the point where many individuals first come into contact with the courts." H.R.Rep. No. 1629, 90th Cong., 2d Sess., reprinted in 1968 U.S.C.C.A.N. 4252, 4257.[4] These judicial officers are appointed by a majority of the judges of the district court for a term of eight years, and may be removed only for cause. 28 U.S.C. §§ 631(e) and (i). Congress not only set certain minimum qualifications, it also expressly provided that a United States magistrate be selected pursuant to standards and procedures promulgated by the Judicial Conference of the United States. Such standards and procedures must "contain provision for public notice of all vacancies in magistrate positions and for the establishment by the district courts of merit selection panels, composed of residents of individual judicial districts, to assist the courts in identifying and recommending persons who are best qualified to fill such positions." 28 U.S.C. § 631(b)(5). The standards promulgated by the Judicial Conference require that the selection of United States magistrate judges be made from a list of nominees (up to five for each vacancy) who have been found by the merit selection panel to "possess the same types of personal and professional qualities expected of district judges."[5]
The Federal Magistrate Act also abandons the fee system and provides that United States magistrates may not engage in the practice of law or any other business "inconsistent with the expeditious, proper and impartial performance of their duties as judicial officers." 28 U.S.C. § 632(a).[6] *1024 United States magistrates today receive a salary close to that of district court judges, which cannot be reduced during their term in office, 28 U.S.C. § 634(a) and (b), and are provided with law clerks to assist them in their work. Administrative Office of the United States Courts, Legal Manual: United States Magistrates § 1.10. Indeed, in 1990, Congress changed the title of these judicial officers to "United States magistrate judge" in order to "reflect more accurately the responsibilities and duties of the office." Judicial Improvements Act of 1990 § 321, Pub.L. No. 101-650, 104 Stat. 5089, 5117 (1990); H.R.Rep. No. 734, 101st Cong., 2d Sess. 31 (1990), reprinted in 1990 U.S.C.C.A.N. 6802, 6877.
The lesson to be drawn from this legislative history is that the referral of an eavesdropping application to a United States magistrate judge does not implicate any of the concerns underlying Title III's facially restrictive definition of judges who are competent to issue eavesdropping orders. The office of United States commissioner, at which that definition was directed, no longer exists; and the concerns about the competence and professionalism of those serving as United States commissioners do not apply to those serving as United States magistrate judges. Indeed, United States magistrate judges enjoy tenure, compensation and independence comparable to that of many state judges who today issue orders pursuant to Title III.[7]
Moreover, it is not material that, after it enacted the Federal Magistrates Act, Congress failed to confer on United States magistrate judges the authority to entertain a Title III application. While Congress clearly contemplated that United States magistrate judges would perform other functions that were vested in United States district court judges, the assumption was that these duties could be referred to a United States magistrate judge if they came within the broad grant of delegable authority specified in 28 U.S.C. § 636(b).[8] Indeed, Congress rewrote Section 636(b) in 1976 to overcome a crabbed judicial construction of the Federal Magistrates Act and to make plain its intent to override any inconsistency that may derive from the fact that a delegable duty within the scope of the clause is vested in a "judge" or a "court." As the Senate Judiciary Committee Report explained:
The initial sentence of the revised section uses the phrase "notwithstanding any provision of law to the contrary". This language is intended to overcome any problem which may be caused by the fact that scattered throughout the code are statutes which refer to "the judge" or "the court." It is not feasible for the Congress to change each of those terms to read "the judge or a magistrate." It is, therefore, intended that the permissible assignment of additional duties to a magistrate shall be governed by the revised section 636(b), "notwithstanding any provision of law" referring to "judge" or "court."
S.Rep. No. 625, 94th Cong., 2d Sess. 7 (1976); H.R.Rep. No. 1609, 94th Cong.2d Sess. 9 (1976), reprinted in 1976 U.S.C.C.A.N. 6162, 6169.
Particularly apposite here is the recent holding of the Court of Appeals for the Second Circuit that the empaneling of a grand jury may be referred to a United States magistrate judge even though the Jury Selection Service Act confers such *1025 authority only on "[t]he Chief Judge of the District Court, or such other district court judge as the [the district's jury selection] plan may provide...." 28 U.S.C. 1865(a) (1988). United States v. Diaz, 922 F.2d at 1002. In an opinion by Judge Kearse, the Court of Appeals held that "the apparent limitation in the Jury Act is overridden by [the "pretrial matters" clause,] 28 U.S.C. § 636(b)(1)(A)." Id. at 1002.
The "pretrial matters" clause, it will be recalled, provides that "[n]otwithstanding any provision of law to the contrary ... a judge may designate a magistrate to hear and determine any pretrial matter pending before the court," except for eight specified dispositive motions. 28 U.S.C. § 636(b)(1)(A). Because "[t]he selection and empaneling of a grand jury are not among the tasks expressly excluded from this authorization, and they plainly occur prior to any part of the trial," the Court of Appeals concluded that "[o]n its face ... § 636(b)(1)(A) appears to authorize delegation of the pretrial functions of grand jury selection and empaneling to a magistrate." Diaz, 922 F.2d at 1002.
The Court of Appeals then examined the legislative history of section 636(b)(1)(A), which made no reference to the delegation of such authority to a magistrate. Based on other pretrial and preliminary matters that Congress clearly contemplated could be referred to a United States magistrate judge, the Court of Appeals found that it was unlikely that Congress meant to withhold from that judicial officer the authority to empanel grand juries. Diaz, 922 F.2d at 1004. The same legislative history demonstrates that Congress contemplated that the issuance of search warrants, among other pre-indictment matters, would fall within the ambit of the "pretrial matters clause." See H.R.Rep. No. 1609, 94th Cong. 2d Sess. 7, 9 (1976), reprinted in 1976 U.S.C.C.A.N. 6162, 6167-69.
While electronic eavesdropping is potentially more invasive of privacy than ordinary searches and seizures, and while Congress was unwilling to entrust to United States commissioners the responsibility of determining whether either of these intrusions should take place, it is unlikely that Congress intended that the same judicial officer it found competent to issue a warrant to arrest a person, to ransack his house, and seize his most private papers, be denied the authority to entertain a motion for electronic eavesdropping upon the referral of a district court judge. Under these circumstances, there is no more reason here than in Diaz to deny full effect to the overriding language of the "pretrial matters" clause.

B. The "Additional Duties" Clause

One of the 1976 amendments to section 636(b) created a separate subsection providing that "a magistrate may be assigned such additional duties as are not inconsistent with the Constitution and the laws of the United States." 28 U.S.C. § 636(b)(3). The House Judiciary Committee emphasized the expansive nature of this "catchall" clause:
A similar provision is contained in the existing legislation. This subsection enables the district courts to continue innovative experimentation in the use of this judicial officer. At the same time, placing this authorization in an entirely separate subsection emphasizes that it is not restricted in any way by any other specific grant of authority to magistrates.
. . . . .
If district judges are willing to experiment with the assignment to magistrates of other functions in aid of the business of the courts, there will be increased time available to judges for the careful and unhurried performance of their vital and traditional adjudicatory duties, and a consequent benefit to both efficiency and the quality of justice in the Federal courts.
H.R.Rep. No. 1609, 94th Cong. 2d Sess. 12 (1976), reprinted in 1976 U.S.C.C.A.N. 6162, 6172; S.Rep. No. 625, 94th Cong., 2d Sess. 10-11 (1976). This expansive expression of congressional intent is echoed in a number of subsequent Supreme Court decisions. Most recent among these is Peretz v. United States, ___ U.S. ___, 111 S.Ct. 2661, 2671, 115 L.Ed.2d 808 (1991), in which *1026 it was held that "permitting a magistrate to conduct the voir dire in a felony trial when the defendant raises no objection is entirely faithful to the congressional purpose in enacting and amending the Federal Magistrates Act." The Court added:
The generality of the category of "additional duties" indicates that Congress intended to give federal judges significant leeway to experiment with possible improvements in the efficiency of the judicial process that had not already been tried or even foreseen. If Congress had intended strictly to limit these additional duties to functions considered in the committee hearings or debates, presumably it would have included in the statute a bill of particulars rather than a broad residuary clause.
Id., 111 S.Ct. at 2667.[9]
There are two interrelated limitations on the "additional duties" clause that distinguish it from the "pretrial matters" clause. The first, which appears in the text of the clause, is that the delegation of a duty not be "inconsistent" with the laws of the United States. The second, which derives from the gloss the Supreme Court has placed on the clause, is that the delegated duty not be of "far greater importance" than specified duties that may be assigned to magistrates. Peretz, 111 S.Ct. at 2667.
The delegation of a Title III application to a United States magistrate judge is not inconsistent with Title III merely because the latter provides that judges of the United States district courts may issue eavesdropping orders. Any case to which the "additional duties" clause may be applicable will also involve the delegation of some duty that is vested initially in a judge. Accordingly, it would frustrate the intent of Congress if a nonadjudicatory responsibility could not be delegated to a United States magistrate judge merely because that responsibility is specifically conferred on a district court judge. Unless the language or legislative history clearly indicates that Congress did not intend to authorize the delegation of a particular duty, this circumstance alone should not preclude delegation under the "additional duties" clause.[10]See United States v. Khan, 774 F.Supp. 748, 753-54 (E.D.N.Y.1991); In re Grand Jury Appearance of Cummings, 615 F.Supp. at 71.
The preceding discussion has shown that the facially restrictive definition of judges competent to issue Title III orders was not written for the purpose of denying United States magistrate judges the authority to issue such orders. Moreover, it is equally clear that the consideration of such applications is not of far greater importance than the duty these judicial officers perform in overseeing the procedural mechanism that "is central to the Fourth Amendment,"  namely, the antecedent determination whether a search or arrest warrant should issue. Ohio ex rel. Eaton v. Price, 364 U.S. 263, 272, 80 S.Ct. 1463, 1468, 4 L.Ed.2d 1708 (1960) (separate opinion of Brennan, J.).
The findings that must be made by a United States magistrate judge when issuing a search warrant differ only marginally from those which must be made by a judicial *1027 officer who issues an electronic eavesdropping order.[11] Before issuing an eavesdropping order, a judicial officer must determine that there is probable cause to believe that incriminating conversations relating to certain specified offenses will be intercepted and that comparable evidence cannot be obtained through the use of other investigative procedures. 18 U.S.C. § 2518(3)(a), (b) and (c). Similar findings of fact must be made by a United States magistrate judge before authorizing the kinds of significant invasions of privacy for which the Fourth Amendment requires a search warrant. A United States magistrate judge must not only determine that there is probable cause to believe that a crime has been committed and that evidence of criminal activity will be found on the premises to be searched, the magistrate also "must judge the reasonableness of every warrant in light of the circumstances of the particular case, carefully considering the description of evidence sought, the situation of the premises, and the position and interests of the owner or occupant." Zurcher v. Standford Daily, 436 U.S. 547, 570, 98 S.Ct. 1970, 1984, 56 L.Ed.2d 525 (1978) (Powell J., concurring).[12] Fed. R.Crim.P. 41 expressly singles out one such circumstance and requires a United States magistrate judge to consider whether a requisite showing of cause has been made to permit a search to be conducted during nighttime hours. Moreover, where a search implicates First Amendment values, special obligations devolve on the magistrate to ensure that the requirements of the Fourth Amendment are applied with "scrupulous exactitude," Stanford v. Texas, 379 U.S. 476, 485, 85 S.Ct. 506, 511, 13 L.Ed.2d 431 (1965); Zurcher, 436 U.S. at 564, 98 S.Ct. at 1980, and to consider the First Amendment values at stake, "as well as the societal interest in enforcing the criminal laws." 436 U.S. at 571, n. 3, 98 S.Ct. at 1984, n. 3 (Powell, J., concurring).
While the ultimate determination whether to issue a Title III order or to permit its renewal requires judgments comparable to those made in issuing search warrants, the burden of considering these applications makes it a particularly appropriate duty to assign to United States magistrate judges. Specifically, applications for Title III orders are accompanied by long and prolix affidavits. Review of these applications is often time consuming and the judicial officer's task does not end with his or her signature on the order. After the wire interception is in place, there are periodic reports that require the judicial officer to monitor its progress. Moreover, where relevant conversations are seized, the judicial officer will usually be faced with equally lengthy and prolix renewal applications. The referral of these applications by district court judges will plainly further the congressional objective of making increased "time available to judges for the careful and unhurried performance of their vital and traditional adjudicatory duties," and increase the "efficiency and the quality of justice in the Federal courts." H.R.Rep. No. 1609, 94th Cong. 2d Sess. 12 (1976), reprinted in 1976 U.S.C.C.A.N. 6162, 6172; S.Rep. No. 625, 94th Cong., 2d Sess. 10-11 (1976).[13]
The only remaining question presented is whether Article III of the United States Constitution precludes authorization of a wire interception by a magistrate. Recent Supreme Court decisions have upheld the *1028 delegation of certain adjudicatory responsibilities to magistrates. United States v. Raddatz, 447 U.S. 667, 100 S.Ct. 2406, 65 L.Ed.2d 424 (1980) (motion to suppress evidence); Peretz v. United States, ___ U.S. ___, 111 S.Ct. 2661, 115 L.Ed.2d 808 (1991) (jury selection). These cases rested on the availability of de novo review by the district court judge and, in Peretz, the parties' consent. While de novo review by a United States district court judge is available here,[14] neither such review nor the consent of the parties is necessary, because the authorization of a wiretap falls within the category of nonadjudicatory functions that need not be performed by an Article III judge. See Mistretta v. United States, 488 U.S. 361, 389-90 n. 16, 109 S.Ct. 647, 663-64 n. 16, 102 L.Ed.2d 714 (1989) (noting that the issuance of search warrants and the review of wiretap applications are among the nonadjudicatory functions performed by Article III judges).
An eavesdropping order is sought at an investigatory stage, in a nonadversarial context. In reviewing a wiretap application, a magistrate is not resolving a dispute between two parties, but rather is interposing his neutral and detached judgment so that prosecutors and law enforcement officials are not the sole judges of when to use constitutionally sensitive law enforcement techniques. See United States v. United States District Court for Eastern Dist., 407 U.S. 297, 316-17, 92 S.Ct. 2125, 2136-37, 32 L.Ed.2d 752 (1972). While the authorizing officer cannot be subject to the control of the Executive Branch, the Fourth Amendment does not require that such officer be endowed with all of the attributes of an Article III judge:
The substance of the Constitution's warrant requirement does not turn on the labeling of the issuing party. The warrant traditionally has represented an independent assurance that a search and arrest will not proceed without probable cause to believe that a crime has been committed and that the person or place named in the warrant is involved in the crime. Thus, an issuing magistrate must meet two tests. He must be neutral and detached and he must be capable of determining whether probable cause exists for the requested arrest or search.
Shadwick v. Tampa, 407 U.S. 345, 350, 92 S.Ct. 2119, 2123, 32 L.Ed.2d 783 (1972). A United States magistrate judge plainly meets these "two-tests." Indeed, the fact that a sitting United States Magistrate judge is subject to removal for cause and reappointment by the same United States district court judges who review eavesdropping orders (if they are later challenged at suppression hearings) operates to ensure that he will fulfill properly the special responsibilities with which he has been entrusted. Cf. United States v. Karathanos, 531 F.2d 26, 34 (2d Cir.), cert. denied, 428 U.S. 910, 96 S.Ct. 3221, 49 L.Ed.2d 1217 (1976).

CONCLUSION
Accordingly, for the foregoing reasons, the United States Attorney's applications for wire interception orders pursuant to Title III are referred to the United States magistrate judge during the period from today until February 23, 1992 and from October 5, 1992 until October 18, 1992 when I will next serve in the Miscellaneous Part. I am prepared to entertain an application to stay this order to permit the United States Attorney to take such steps as he may deem appropriate if he disagrees with my conclusions. See In re United States, 903 F.2d 88 (2d Cir.1990).
SO ORDERED.
NOTES
[1] Section 2516(1) of Title III provides:

The Attorney General, Deputy Attorney General, Associate Attorney General, any acting Assistant Attorney General, or any Deputy Assistant Attorney General in the Criminal Division specially designated by the Attorney General, may authorize an application to a Federal judge of competent jurisdiction for, and such judge may grant ... an order authorizing or approving the interception of wire or oral communications ...
18 U.S.C. § 2516(1). Section 2510(9)(a) defines "federal judge of competent jurisdiction" as "a judge of the United States district court or a United States court of appeals."
[2] In 1986, Congress amended § 2516(1) to expand the list of officials to whom the Attorney General could delegate the authority to make applications for eavesdropping orders. See note 1, supra.
[3] Remarks of Hon. Joseph D. Tydings, on the Floor of the Senate, October 15, 1965, reprinted in Federal Magistrates Act: Hearings Before the Subcomm. on Improvements in Judicial Machinery of the Senate Comm. on the Judiciary, 89th Cong., 2d Sess. & 90th Cong., 1st Sess. 6, 7 (1966 & 1967) [hereinafter "1966-67 Senate Hearings"].
[4] The possibility of transferring the commissioners' responsibilities to district court judges was considered and rejected by the Subcommittee on Improvements in Judicial Machinery. 1966-67 Senate Hearings at 238-39 (Remarks of Senator Tydings).
[5] Administrative Office of the United States Courts, The Selection and Appointment of United States Magistrates 10, 12-13 (1987). The procedure for reappointment requires the establishment of a similar panel, which reviews the incumbent's performance, considers comments from members of the bar and public, and submits a recommendation to the district court. Id. at 14-16.
[6] The Act discourages the use of part-time magistrates and permits their appointment only where "employment of a full-time magistrate would not be feasible or desirable." 28 U.S.C. § 63(a)(3). Part-time magistrates, who are appointed to a four-year term, are prohibited from serving "as counsel in any criminal action in any court of the United States." 28 U.S.C. § 632(b).
[7] In New York State, Supreme Court Justices and County Court Judges are authorized by Title III to issue eavesdropping orders. 18 U.S.C. § 2510(9); N.Y.Crim.Proc.Law § 700.05(4) (McKinney 1984). Supreme Court Justices are elected for 14 year terms, N.Y.Const. Art. 6, § 6(c) (McKinney 1987), and County Court Judges are elected for ten year terms, N.Y. County Law § 400(1) (McKinney 1991). Their reelection depends on currying favor of party leaders or the vagaries of the electoral process, and their compensation is substantially less than that of United States magistrate judges.
[8] Congress did amend Fed.R.Crim.P. 41 to substitute United States magistrate for United States commissioner as one of the judicial officers authorized to issue search warrants. Federal Magistrates Act of 1968 § 301, Pub.L. No. 90-578, 82 Stat. 1108, 1115 (1968). This contemporaneous amendment of Rule 41 was necessitated by the fact that the Federal Magistrates Act abolished the office of United States commissioner.
[9] Among the duties that have been referred to magistrates under the "additional duties" clause are the review of social security cases for report and recommendation to the district court judge, Mathews v. Weber, 423 U.S. 261, 96 S.Ct. 549, 46 L.Ed.2d 483 (1976), the taking of a guilty plea, United States v. Khan, 774 F.Supp. 748 (E.D.N.Y.1991), the determination of a motion to quash a grand jury subpoena, In re Grand Jury Proceedings Dzikowich, 620 F.Supp. 521 (D.C.Wis.1985), and the issuance of an order granting immunity to a witness and compelling the witness to testify in the grand jury. In re Grand Jury Appearance of Cummings, 615 F.Supp. 68 (D.C.Wis.1985).
[10] This conclusion is implicit in the legislative history of section 636(b)(3). Specifically, the House Judiciary Committee suggested that the additional duties clause would permit magistrates "to accept returns of jury verdicts where the trial judge is unavailable," even though Fed. R.Crim.P. 31 provides that a jury verdict shall be returned to "the judge" in open court, and Fed.R.Crim.P. 25 provides that, if a judge becomes disabled during the course of trial, "any other judge regularly sitting in or assigned to the court ... may proceed with and finish the trial." See H.R.Rep. No. 1609 (1976), 94th Cong., 2d Sess. 12, reprinted in 1976 U.S.C.C.A.N. 6162, 6172; United States v. Arnoldt, 947 F.2d 1120, 1123 (4th Cir.1991).
[11] Cf. In re Grand Jury Proceedings Dzikowich, 620 F.Supp. at 524 (holding that a magistrate has authority to determine a claim of illegal electronic surveillance brought pursuant to 18 U.S.C. § 3504, and noting that such determination is "similar to the reviewing of documentation for search warrants in which magistrates engage on a regular basis."); 18 U.S.C. §§ 3122(a) and 3127(2)(A) (1988) (authorizing a magistrate judge to order the installation of pen registers and trap and trace devices).
[12] Justice Powell cast the deciding vote in Zurcher. The views expressed in his concurring opinion, although somewhat more explicit, are consistent with the majority opinion in which Justice Powell joined.
[13] In 1990, United States district court judges authorized 324 wire interceptions and granted 333 extensions. These figures have been increasing consistently, primarily as a result of an increase in drug investigations. Administrative Office of the United States Courts, Report on Applications for Orders Authorizing or Approving the Interception of Wire, Oral, or Electronic Communications 1, 9 (1991).
[14] The United States Attorney may obtain review of a denial of a Title III order by appealing to the district court judge who referred the application to the United States magistrate judge. The exhaustion of this process would not preclude an application to another district court judge if the initial application was ultimately denied. Of course, the ex parte nature of the proceeding precludes pre-authorization review at the behest of the subject of the interception. An aggrieved party, however, may obtain review of the validity of the order by a district court judge in a subsequent judicial proceeding, 28 U.S.C. § 2515, although not all aspects of such review can accurately be described as de novo. See Illinois v. Gates, 462 U.S. 213, 236, 103 S.Ct. 2317, 2331, 76 L.Ed.2d 527 (1983).