UNITED STATES of America, Appellee,

v.

Hilda AMIEL, Defendant,

Kathryn Amiel, Joanne Amiel and Sarina Amiel, Defendants–Appellants.

Nos. 1021, 1022 and 751, Dockets 95–1286, 95–1287 and 95–1288.

United States Court of Appeals, Second Circuit.

Argued March 28, 1996.

Decided Sept. 5, 1996.

ments, and affirm the defendants' convictions.

Stanley A. Teitler, New York City (Stanley A. Teitler, P.C., New York City), for Defendants–Appellants Kathryn Amiel and Joanne Amiel.

Bennett M. Epstein, New York City, for Defendant–Appellant Sarina Amiel.

Edgardo Ramos, Assistant United States Attorney, Brooklyn, NY (Zachary W. Carter, United States Attorney, Eastern District of New York, Peter A. Norling, Shari D. Leventhal and Gary Brown, Assistant United States Attorneys, Brooklyn, NY, of counsel), for Appellee.

Before: NEWMAN, Chief Judge, and OAKES and PARKER, Circuit Judges.

PARKER, Circuit Judge:

Kathryn, Joanne, and Sarina Amiel appeal from a judgment of conviction entered in the Eastern District of New York on May 12, 1995 (Thomas C. Platt, *Judge* ) following a jury trial. The Amiels were convicted of conspiracy to commit mail fraud in violation of 18 U.S.C. § 371, and various counts of mail fraud, in violation of 18 U.S.C. § 1341. These charges stem from the Amiels' alleged distribution of fraudulent artwork attributed to Chagall, Dali, Miro and Picasso, and falsely represented to be pencil signed by those artists.

On appeal, the defendants argue that (1) the evidence upon which their convictions were based was legally insufficient; (2) the district court erred in denying their Rule 33 motion for a new trial based on newly discovered evidence; and (3) their convictions and sentences were barred by double jeopardy, as they had already been subject to civil forfeiture proceedings. Sarina Amiel additionally argues that the judge's derogatory comments to defense counsel in front of the jury deprived her of a fair trial. For the reasons stated below, we reject these argu-

## I. BACKGROUND

Leon Amiel, father to Kathryn and Joanne, and grandfather to Sarina, was a major force in the art world before his death in 1988. One of the most prominent American publishers of modern art, Leon enjoyed personal friendships with Chagall, Dali, Miro and Picasso.[1]

Leon was President and owner of Amiel Book Distributors Corporation and Leon Amiel Publishing, Incorporated. Through these companies, he possessed and marketed a substantial inventory of print and lithograph art. The government has revealed that it was investigating Leon before his death for circulating fraudulent prints.

After Leon's death in October 1988, his brother Sam briefly ran his companies. However, Leon's wife, Hilda, fired Sam after she discovered that he was stealing paintings. Hilda took over the company's operation with the help of her daughters, Kathryn and Joanne.[2] Hilda, Kathryn and Joanne became officers of Leon Amiel Book Distributors Corporation, and of a new company that they founded called Original Artworks, Ltd. Hilda and Kathryn ran both companies full-time, while Joanne worked part-time on sales, bookkeeping, and day-to-day activities. Sarina, Kathryn's daughter and a full-time college student at Boston University, was a periodic employee and account representative for Original Artworks, responsible for sales and customer service.

### A. The Civil Proceedings Against the Amiels

In July 1991, following an undercover investigation of the Amiels' sales practices, the government instituted civil forfeiture proceedings against several million dollars worth of the Amiels' real and personal property, alleging that the property was subject to forfeiture under 18 U.S.C. § 981. The Amiels failed to serve any responsive pleadings

---

1. In order to distinguish between members of the Amiel family, we will refer to them by their first names.

2. Hilda was a defendant in this case until her death prior to trial.

to the Verified Complaint or any response to the first set of interrogatories, prompting the government to move for a default judgment. After the Amiels failed to file any declarations, affidavits, memoranda of law or other written responses to the government's motion, the district court entered a default judgment, on October 30, 1991. The court rejected the Amiels' motion for an order vacating this decree on the ground of excusable neglect, and the Amiels failed to appeal this decision in a timely fashion.

## B. The Criminal Proceedings

On March 2, 1992, the government filed a 30–count criminal indictment against Kathryn, Joanne, and Sarina Amiel charging them with mail fraud and conspiracy to commit mail fraud. Counts 1–3 of the indictment charged the Amiels with mail fraud in connection with their sale of allegedly fake prints to two undercover government investigators, Leung and Hang, who posed as art dealers interested in purchasing authentic works of art. Counts 4–29 also alleged mail fraud, in connection with the Amiels' sales to three art dealers, Coffaro, Wallace, and Groeger. Count 30 of the indictment charged the Amiels with conspiring with Coffaro, Wallace, and Groeger to commit mail fraud.

The Amiels moved to dismiss the indictment on the grounds that the forfeiture judgment created former jeopardy in violation of the double jeopardy clause of the Constitution. The district court denied this motion, and this court affirmed, without prejudice to renewal of the motion by the defendants at the conclusion of trial. *United States v. Amiel,* 995 F.2d 367, 371–72 (2d Cir.1993).

## C. Evidence Presented at Trial

### 1. *The Art Distributors*

Philip Coffaro, an art dealer, testified pursuant to a cooperation agreement with the government. Coffaro began purchasing artwork from Leon Amiel on a regular basis in 1979. Initially, Coffaro believed that the works he purchased from Leon Amiel were authentic. However, within approximately two years Coffaro concluded that the artwork he obtained from Leon was "no good," based on criteria such as the quantity of the material available, its color, and the paper. Nevertheless, Coffaro continued to purchase artwork from the Amiels.

Coffaro told the jury that he had seen works of art being printed at the Amiels' Secaucus facility, and had later purchased these prints as limited edition lithographs. Leon once told Coffaro that he purchased some of his counterfeits in Europe. On one occasion, Coffaro had seen Leon fraudulently sign and number pieces of artwork created at his Secaucus facility. Leon also instructed Coffaro on how to place fake edition numbers on the fake prints so as to avoid detection.

The jury also heard replayed a consensually-recorded telephone conversation between Coffaro and another of the defendants' distributors, Zabrin.[3] During that conversation, Coffaro explained to Zabrin that Leon Amiel purposefully kept his inventory of fake prints in an unsigned state, forging the signatures of the artist only when orders were placed. This way, in the event he was discovered, he could explain that he was simply selling the prints as unsigned posters.

Coffaro presented evidence indicating that the defendants continued to fraudulently distribute fake prints following Leon's death. Coffaro described a meeting, after Leon's death, with Hilda, Joanne, and Kathryn, to discuss Coffaro's prerequisites for doing business with them. He complained to the Amiels that the quality of their artwork was "downgrading." He wanted a guarantee that the material he got from them would be "clear. No ink stains. Dimensions ... correct, etcetera, etcetera." Hilda told Coffaro that they had already "taken care of most of that in Secaucus, and the material was looked at and everything that looked bad was thrown out." She also promised him a letter verifying the authenticity of prints he purchased.

Coffaro continued to purchase purportedly limited edition, hand-signed prints from the defendants. He placed orders, often over the telephone, with Hilda, Kathryn, or, on

---

3. This conversation was recorded prior to Coffaro's arrest.

occasion, Joanne. In keeping with the course of dealing he established with Leon, the prints Coffaro purchased were usually pencil-signed by the purported artist, but not numbered.

However, Coffaro continued to be dissatisfied with the quality of the work he received from the Amiels. In particular, he was having problems with the signatures, which Zabrin told him "looked child like and were horrible." On one occasion, when Coffaro complained to Kathryn about the poor signature quality, she assured him that the signatures would be better when Sarina returned from college. On another occasion, Coffaro received a group of prints purportedly by Calder that "were so bad that [he] didn't even want to show them to people." When he confronted Hilda and Kathryn with this problem, Kathryn told him "look, I know the Calders are terrible, my mother had my uncle signing them, but Sarina will be coming home soon and they will be better."

Coffaro testified that he falsely represented the works he purchased from the Amiels as genuine when he sold them, thereby defrauding the public.

Thomas Wallace, an art dealer and a retired New York City police officer, also testified pursuant to a cooperation agreement with the government. Like Coffaro, Wallace purchased purportedly limited-edition, hand-signed prints from Leon that he knew to be counterfeit. Like Coffaro, he also provided numerous details about Leon Amiel's fraudulent practices.

Some time after Leon's death, Wallace met with Hilda, Kathryn, Joanne, and Sarina to discuss his future business dealings with the Amiels. The defendants told Wallace that they would continue selling to him, but Joanne told him that there wouldn't be any certificates of authenticity—that "the product would be sold as is, the way her father sold it." Wallace said that this arrangement would be unacceptable, and the matter was left unresolved.

Around this time, Wallace also helped the Amiels conduct an inventory of their facility in Secaucus, New Jersey. During the course of the inventory, Wallace saw large quantities of prints, some signed, some unsigned. There were stacks of as many as 100 of a particular print, but only the first one or two had pencil signatures.

On one occasion, Wallace purchased 20 pieces from the Amiels, and two of them arrived unsigned. After placing a notation on the back of each print, he returned the two unsigned pieces to Sarina, who told him that she would take care of it. A couple of days later, he picked up the same prints, and they had been signed.

Wallace also testified that he represented to the public that the counterfeit artwork he purchased from the Amiels was genuine.

A third art dealer, Lawrence Groeger, testified against the Amiels pursuant to a cooperation agreement. Groeger had begun purchasing purportedly limited-edition prints directly from Leon Amiel in early 1988. He knew these works were fraudulent because of the large quantity available.

Groeger continued to do business with the Amiels after Leon's death. He met with Kathryn, Joanne, Hilda and Sarina in New York in early 1989. According to his testimony:

I was told at that meeting I should do all my ordering through Sarina, and she was in charge of the warehouse, and she knew where the material was, and how to locate it. If I had questions about what was available or not, that I should ask her about that.

Also, I was told that Joanne Amiel would be doing the bookkeeping and I was to talk to her about any questions regarding bookkeeping matters.

Also at this meeting, Groeger mentioned a problem he was having with the California galleries with which he did business. "[A] lot of the galleries were aware of the fact that there were multiple copies of Miro prints available for sale." He explained that "this created a lot of suspicion ... regarding the authenticity of the prints." The Amiels assured Groeger that they would protect him in the California market. "[T]hey also thought it was a good idea not to put any—many prints on the west coast."

Groeger's largest customer, the Upstairs Gallery, was raided by the Los Angeles Police Department in September. Many of the prints that were confiscated had been originally purchased through the Amiels by Groeger. Following the raid, Groeger met with Joanne, Hilda, Kathryn, and Sarina to ask for their assistance. Joanne promised to help Groeger obtain some documentation for the paintings, but never followed through. That October, Groeger was raided by the police, who seized 60 pieces of inventory, as well as a package of prints that Groeger had planned to send back to the Amiels. All of this artwork was determined to be fake.

## 2. Additional Evidence

Marc Kniebihler, a chromist who worked for Leon from 1983 until 1988, testified pursuant to an immunity agreement with the government. As a chromist, Kniebihler actually created the fraudulent artwork marketed by the Amiels. He testified extensively about the procedures used by Leon to create and sell fraudulent artwork. Kniebihler also testified about his relationship with the defendants following Leon's death.

In a meeting with Kniebihler, Kathryn, Joanne and Sarina, Hilda advised Kniebihler that the Amiels wanted to continue the business following Leon's death. Kniebihler agreed to stay on, on the condition that he not "be paid with the prints that were created at the workshop. I wanted to be paid with prints preferably made by the artist and signed by the artist." He advised them that if they ran a "good workshop . . . [without] legal problems . . . a clean business[,] they could become profitable over the long run."

Sometime in 1989 or 1990, Hilda and Kathryn told Kniebihler that they were experiencing some financial difficulty. Kniebihler agreed to catalog the inventory in their Island Park facility and to tell the defendants how much each piece was worth. He told them that if the prints were fake, they were not worth anything, and would not be included in the inventory.

After this meeting, Kniebihler discovered that the Amiels had sold a set of his Miro reproductions as original, pencil-signed prints to Flemming Hall, a European dealer

and major customer to the Amiels. Kniebihler met with Hilda and Kathryn and told them that all of the prints created in Secaucus were fake, and that they "have to clean up the act, either clean it up right away or forget about the whole thing." After that, Kniebihler was denied access to the inventory at the Island Park location. In addition, Kniebihler once warned Kathryn and Hilda that Coffaro was a "crook" who specialized in fake prints. Nevertheless, the Amiels continued to do business with him.

Susan St. Marie was a secretary receptionist for Original Artworks from October 1989 to November 1990. Part of her job was to open incoming mail. However, she testified that she was not allowed to open mail from Flemming Hall or Phil Coffaro, the companies' two major customers. The mail from these individuals was put aside for Joanne and Hilda Amiel. St. Marie also testified that Hilda once cautioned her to be careful to charge customers the proper tax because she did not want to attract any attention to the business. Hilda specifically told St. Marie that she was concerned about "what is going on in the back with my granddaughter," and then made a writing gesture.

St. Marie also testified that Sarina returned to New York from college whenever there was a big order to be filled, even once during a big snow storm.

Several well-qualified art experts testified to the fact that the bulk of Leon's print and lithograph inventory consisted of fakes.

## 3. The Undercover Investigation

On account of the government's suspicions about the Amiels' business practices, Postal Inspector Waiman Leung approached members of the Amiel family under the guise of an art dealer from Asia interested in purchasing genuine works of art. He purported to be especially interested in works by Dali, Miro, Chagall and Picasso. After their first meeting, Leung purchased 22 prints purportedly created by these artists and bearing pencil signatures. However, he received no documentation as to the prints' authenticity. Kathryn Amiel clearly told him that she did not have any documentation for some of the

pieces and did not know of their provenance. She told Leung that the only documentation she had was her father's, and that she could not make any guarantees on art she didn't purchase herself. She insisted on selling the pieces "as is."

With the assistance of another undercover agent, Raymond Hang, Leung continued to press Kathryn and Sarina, who was home from college, for documentation as to the pieces' authenticity. Finally, after much coaxing, the Amiels agreed to rewrite, on their letterhead, the information that had been contained in Leon Amiel's documents. They mailed this information to the investigators.

In July 1991, following the undercover investigation, the government executed a search warrant for the Amiels' Island Park facility and seized approximately 70,000 prints. During this search, the government found and seized stacks of particular prints, the first few signed, the remainder unsigned, consistent with the practice of maintaining an inventory in unsigned condition.

Also seized from the Amiels' facility during the raid was a copy of a fax sent by Sarina to Flemming Hall, the defendants' European distributor. The fax consisted of a "Quote of the Day" from Leon, in which he stated, "I don't know how these people sell to the public, what they claim and how they sell it is something I don't get involved with." Sarina had hand written a note on the top of the page: "I was rummaging through a drawer and I came across this quote! I hope you enjoy it as much as we did!!!" Copies of the fax were found posted on the wall of the defendants' Island Park facility on the day of the raid, under the heading "words to live by . . ." and the notation "S."

Kathryn and Sarina were convicted on counts 1–3, pertaining to the sales to Leung. Joanne was acquitted of these three counts. Kathryn and Joanne, but not Sarina, were convicted of mail fraud in connection with sales to Coffaro. Kathryn and Sarina, but not Joanne, were convicted in connection with sales to Wallace. The jury convicted all three defendants on a number of the counts pertaining to sales to Groeger, and on the single conspiracy count. Kathryn was sen-

tenced to 78 months in prison, to be followed by three years of supervised release and a special assessment of $1,200. Joanne was sentenced to 46 months, to be followed by three years of supervised release and a special assessment of $800. Sarina was sentenced to 33 months in prison, to be followed by three years of supervised release and a special assessment of $950.

### D. The Post–Trial Proceedings

Following their convictions, the defendants renewed their double jeopardy motion. However, the district court once again denied it. *See infra* section IIC.

The Amiels also moved the court for a new trial based on newly discovered evidence pursuant to Fed.R.Crim.P. 33, and for an evidentiary hearing pursuant to the motion. The motion was based on the government's alleged suppression of information concerning Thomas Wallace and Lawrence Groeger, two of the cooperating witnesses who testified at trial. According to the Amiels, the government had concealed evidence pertaining to Wallace's "deep involvement" in organized crime, permitted him to commit perjury on the witness stand, and contributed to Wallace's misrepresentations by bolstering his credibility before the jury. As for Groeger, the Amiels claim that the government failed to disclose evidence that Groeger participated in the sale of two fraudulent Chagalls after he signed a cooperation agreement with the government. The district court denied the motion without conducting a hearing.

## II. DISCUSSION

### A. Sufficiency of the Evidence

The Amiels bear a very heavy burden in challenging the sufficiency of the evidence. *United States v. Puzzo*, 928 F.2d 1356, 1361 (2d Cir.1991); *United States v. Nusraty*, 867 F.2d 759, 762 (2d Cir.1989). In reviewing this claim, the court must "view the evidence in the light most favorable to the government and construe all possible inferences in its favor." *United States v. Badalamenti*, 794 F.2d 821, 828 (2d Cir.1986). "If 'any rational trier of fact could have found the essential elements of the crime,' the conviction must

stand." *Id.* (quoting *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979)).

The government presented evidence that, if believed by the jury, more than sufficed to support guilty verdicts against the Amiels.

### 1. *Counts 4–29: Substantive Mail Fraud Convictions for Sales to Coffaro, Wallace and Groeger*

Each of the defendants was convicted of some but not all of the mail fraud counts pertaining to the sale of art to Coffaro, Wallace and Groeger. We conclude that the evidence suffices to support these convictions.

■ An individual may be convicted under the federal mail fraud statute for "devis[ing] or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises." 18 U.S.C. § 1341. As relevant to this case, the elements of a mail fraud violation are: (1) a scheme to defraud (2) money or property, and (3) the use of the mails to further the scheme. *United States v. Wallach,* 935 F.2d 445, 461 (2d Cir.1991); *see United States v. Altman,* 48 F.3d 96, 101 (2d Cir.1995).

The Amiels do not contest that the evidence sufficed to prove the second or third prong of the mail fraud statute—they used the mails in furtherance of property sales. They do, however, contest the sufficiency of the evidence pertaining to the first prong—the existence of a scheme to defraud.

■ To establish the existence of a scheme to defraud, the government must prove that the defendants possessed fraudulent intent. *United States v. Schwartz,* 924 F.2d 410, 420 (2d Cir.1991). The jury could convict the Amiels on the charges pertaining to the dealers, at least on an aiding and abetting theory, which was charged in the indictment, if it concluded that the Amiels acted with knowledge that their products would be sold through the misrepresentations of the dealers. *U.S. v. Zambrano,* 776 F.2d 1091, 1097 (2d Cir.1985).[4] The evidence summarized above supports this conclusion, because it supports two inferences about each defendants' state of mind: she knew the works were fake, and she knew the dealers would pass them off as genuine.

■ We readily reach this conclusion as to Kathryn and Sarina Amiel. The jury was presented with extensive evidence that Sarina was forging artists' signatures with her mother Kathryn's knowledge and encouragement. On two separate occasions Coffaro complained to Kathryn about the poor quality of signatures, and she replied that the signatures would be better when Sarina returned from college. Wallace returned two unsigned pieces to Sarina, only to retrieve the same pieces two days later bearing signatures. Hilda warned Susan St. Marie not to attract attention to the business because of "what is going on in the back with my granddaughter." Kniebihler told Kathryn that all of the pieces created in Secaucus were fake, but later discovered that the Amiels were selling these pieces to Flemming Hall as genuine limited-editions.

Likewise, the evidence more than suffices to support the conclusion that Kathryn and Sarina knew that their dealers were defrauding the public. Kniebihler warned Kathryn that Coffaro was a "crook" who specialized in fake prints. Coffaro complained at length to all three defendants about the poor quality of the forged signatures—this supports an inference that the defendants knew that he was representing the works as genuine. Groeger told all three defendants that he was having trouble with California galleries—they were becoming suspicious about the authenticity of prints originating from the Amiels. And, in a meeting with all three defendants, Wallace insisted on receiving certificates of authenticity with his purchases, which had to indicate that he was planning on representing the works as genuine. Finally, the quote Sarina

---

4. To convict a defendant of aiding and abetting, the government must prove "(1) commission of the underlying crime, (2) by someone other than the defendant, (3) a voluntary act or omission by the person charged as an aider and abettor, with (4) the specific intent that his act or omission bring about the underlying crime." *United States v. Zambrano,* 776 F.2d 1091, 1097 (2d Cir.1985).

posted on the wall of the Island Park facility implies that she, and anyone who saw it, at least *suspected* that the dealers were making fraudulent claims to the public.[5]

Although the evidence presented against Joanne was weaker than against Kathryn and Sarina, it was sufficient to support her conviction on the counts pertaining to Coffaro and Groeger.[6] Joanne was present at the meeting in which Coffaro complained to the Amiels that the quality of their artwork was deteriorating, and in which Kathryn promised him certificates of authenticity for all of the works he purchased. Having heard that she was privy to Coffaro's complaints and demands, the jury could have inferred Joanne's guilty knowledge. This inference is also supported by Groeger's testimony. Joanne attended a meeting in which Groeger told the defendants that his California galleries were becoming suspicious of the number of Miro prints placed on the market through the Amiels. The Amiels assured him that they would "protect him" on the California market and avoid placing too many prints on the west coast. Additionally, when Upstairs Gallery was raided, Joanne told Groeger that she would help him obtain some documentation to back up artwork that proved to be fraudulent. These facts support an inference of guilty knowledge.

2. *Counts 1–3: Substantive Mail Fraud Convictions for Sales to the Government Agents*

Kathryn and Sarina were also convicted of mail fraud in connection with their transactions with the government agents, Leung and Hang.[7] Although the evidence on these counts is more tenuous, it also suffices to support their convictions.

Again, the Amiels do not contest the second or third prong of the mail fraud statute—they used the mails in furtherance of sales to Leung and Hang. They claim that the evidence does not suffice to prove the existence of a scheme to defraud. We disagree.

Under the guise of an investor interested in purchasing authentic works of art, Leung met with Kathryn or Sarina on four occasions and purchased numerous works of purportedly authentic art. The vast majority of these works were deemed fake by the experts called at trial.

When the Amiels' Island Park Warehouse was raided, it contained stacks of the very prints the Amiels had sold to the undercover agents, some signed, some unsigned. For example, the warehouse contained fifty copies of Chagall's "Monumental Works," four of which were signed and numbered, forty-six of which were unsigned and unnumbered. The Amiels had sold Leung a signed copy and provided a certificate of authenticity. The warehouse contained 221 copies of Dali's "Jaust", five of which were signed and unnumbered, 216 of which were unsigned and unnumbered. Leung had also received a certificate of authenticity in connection with this signed work. And the warehouse contained 252 copies of Miro's "Symphony—Sala Pelaires", one of which was signed and numbered, sixteen of which were signed and unnumbered, and 235 of which were unsigned and unnumbered. The Amiels sold this work to Leung in signed form, and provided Leung with a certificate of authenticity.

When considered in conjunction with other evidence provided at trial, this information suffices to support an inference that the Amiels knowingly and fraudulently sold unauthentic art to Leung. First, according to the experts at trial, most of the art sold to Leung was, in fact, fake. There was extensive testimony that the Amiels' customarily signed artists' names to prints. And, there was testimony indicating that the Amiels waited

---

**5.** As evidence of their lack of guilty knowledge, the Amiels point out that Kathryn refused to do business with Groeger "as soon as she learned he was altering prints." Kathryn did cut off business with Groeger following a government raid on his facility. However, the jury may have believed that Kathryn was simply trying to distance herself from Groeger because he had been caught. Regardless of what the jury thought of this one piece of evidence, it fails to rebut the many other pieces of evidence that were sufficient to allow the jury to infer guilty knowledge.

**6.** The jury acquitted Joanne on the counts pertaining to Wallace.

**7.** Joanne was acquitted of these three counts.

to sign forged prints until just before selling them so that, if they were raided, they could claim that they planned on selling the stacks of forgeries as unsigned prints. Given the plentiful unsigned warehouse supply of many of the prints the Amiels sold to Leung, the jury could have inferred that someone in the Amiel family (likely Sarina) signed the prints that were sold to Leung. The posting of a certificate of authenticity for such a work could properly be found to constitute mail fraud.

### 3. Count 30: Conspiracy to Commit Mail Fraud

■ Finally, the evidence was sufficient to support the Amiels' convictions for conspiring with Coffaro, Wallace, and Groeger to commit mail fraud. (Count 30). To obtain a conspiracy conviction, the government must prove that there was an agreement between two or more participants to achieve a particular illegal end. *United States v. Stavroulakis,* 952 F.2d 686, 690 (2d Cir.), *cert. denied,* 504 U.S. 926, 112 S.Ct. 1982, 118 L.Ed.2d 580 (1992). "The agreement need not be shown to have been explicit. It can instead be inferred from the facts and circumstances of the case." *Iannelli v. United States,* 420 U.S. 770, 777 n. 10, 95 S.Ct. 1284, 1289 n. 10, 43 L.Ed.2d 616 (1975). A tacit understanding will suffice to show agreement for purposes of a conspiracy conviction. There need not be any written statement or even a speaking of words which expressly communicates agreement. 2 Wayne R. LaFave & Austin W. Scott, Jr., *Substantive Criminal Law* § 6.4, at 71 (1986). Furthermore, the participants in a conspiracy need not be fully aware of the details of the venture so long as they agree on the "essential nature of the plan." *Stavroulakis,* 952 F.2d at 690. Finally, evidence sufficient to link a particular defendant to a conspiracy " 'need not be overwhelming.' " *United States v. Atehortva,* 17 F.3d 546, 550 (2d Cir.1994) (quoting *United States v. Rivera,* 971 F.2d 876, 891 (2d Cir.1992)), and may be demonstrated by circumstantial evidence. *Id.*

■ The above discussion demonstrates that there was sufficient evidence from which the jury could infer that there was at least a tacit agreement between the Amiels and their dealers that the Amiels would provide fake artwork, and that the dealers would pass it off to the public as genuine. This suffices for a conviction for conspiracy to commit mail fraud.

■ Finally, the Amiels make several arguments based on the abstract nature and value of art. Most of these arguments get at the same point: authenticity is a matter of wide interpretation, and it is therefore impossible to say that the art at issue was fake. We find this argument to be completely meritless. It might be difficult to determine whether some art is genuine, but not when Sarina Amiel is forging artists' signatures.

In conclusion, the government presented sufficient evidence for a reasonable jury to find all of the elements of mail fraud and conspiracy beyond a reasonable doubt.

### B. The Brady Material

The second question raised by the Amiels is whether the district court erred in denying their motion for a new trial based on alleged non-compliance by the government with the disclosure requirements of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). We hold that it did not.

■ In *Brady v. Maryland,* the Supreme Court held that:

the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.

*Id.* at 87, 83 S.Ct. at 1196–97. A new trial is warranted under *Brady* where (1) the government failed to disclose favorable evidence, and (2) the undisclosed evidence was material. *United States v. Payne,* 63 F.3d 1200, 1208 (2d Cir.1995) (citing *Brady,* 373 U.S. at 87, 83 S.Ct. at 1196–97), *cert. denied,* —— U.S. ——, 116 S.Ct. 1056, 134 L.Ed.2d 201 (1996). Evidence is material when "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley,* 473 U.S.

667, 682, 105 S.Ct. 3375, 3383, 87 L.Ed.2d 481 (1985). "A 'reasonable probability' of a different result is ... shown when the Government's evidentiary suppression 'undermines confidence in the outcome of the trial.'" *Kyles v. Whitley*, —— U.S. ——, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995) (quoting *Bagley*, 473 U.S. at 678, 105 S.Ct. at 3381). Evidence of impeachment is material if "the witness whose testimony is attacked supplied the only evidence linking the defendants to the crime, or where the likely impact on the witness's credibility would have undermined a critical element of the prosecution's case." *United States v. Wong*, 78 F.3d 73, 79 (2d Cir.1996) (internal quotation marks and citations omitted). Suppressed evidence is not material when it "merely furnishes an additional basis on which to impeach a witness whose credibility has already been shown to be questionable." *Id.* (internal quotations omitted).

▮▮ The Amiels claim that the government suppressed impeachment evidence pertaining to Groeger and Wallace. First, they argue that the government knew, yet failed to disclose, that Wallace had participated in multiple murders, and was connected to organized crime. Next, they accuse the government of deliberately suppressing information in its possession that Groeger had breached his cooperation agreement by selling two Chagalls with fraudulent certificates of authenticity. The district court denied this motion on the ground that, even assuming arguendo that the government had a duty to disclose this information, it was not material.

> [T]he prosecution produced an overwhelming amount of evidence against the Defendants in addition to, and by no means dependent upon, Mr. Wallace and/or Mr. Groeger's testimony....
>
> [T]here was no piece of evidence or testimony in the *Amiel* trial that this Court regards as singularly critical to the verdict. Rather, the evidence against the Defendants was both overwhelming and evenly balanced.... As a result, even if this Court assumes that Defendants' allegations regarding Wallace and Groeger are true, they are not reasonably likely to have

affected the jury's judgment or changed the jury's verdict.

We reach the same conclusion as the district court, but for slightly different reasons. If the government withheld information that Wallace was deeply involved in organized crime and had committed several murders, we would have difficulty deeming the resulting error harmless. However, the Amiels support these allegations with the testimony of a discredited government witness in another proceeding, Dominic Mongelli. Following Mongelli's revelations, the government confirmed that Suffolk County authorities had questioned Wallace, and that he was not a suspect in any investigation and was not arrested in connection with any organized crime activity. The government has no *Brady* obligation to "'communicate preliminary, challenged, or speculative information.'" *United States v. Diaz*, 922 F.2d 998, 1006 (2d Cir.1990) (quoting *United States v. Agurs*, 427 U.S. 97, 109 n. 16, 96 S.Ct. 2392, 2400 n. 16, 49 L.Ed.2d 342 (1976) (citations omitted)). After investigating possible wrongdoing by Wallace, the Amiel prosecution found no evidence to support Mongelli's accusations. Pursuant to *Diaz*, it had no obligation to inform the defense.

▮▮ In addition, we agree with the district court that any evidence of dishonesty stemming from the disclosures about Wallace and Groeger was not reasonably probable to lead to a different result. First of all, the impeachment evidence was cumulative. Wallace underwent extensive cross-examination into his past criminal record, his use of illegal drugs, his guilty plea, his cooperation agreement with the government, lies he had previously told while under oath, and the fact that he caused an employee to submit a false affidavit in a legal proceeding. Groeger was also questioned about his past criminal record, and his agreement to cooperate with the government. *See United States v. Diaz*, 922 F.2d 998, 1007 (2d Cir.1990), *cert. denied*, 500 U.S. 925, 111 S.Ct. 2035, 114 L.Ed.2d 119 (1991) (finding evidence that an informant had stolen $18,000 from the government to be cumulative because defendants had impeached the witness at trial by pointing out that he had an expectation of financial gain

for testifying, and that he had attempted to withhold $15,000 in the case).

Moreover, independent evidence tied each defendant to the criminal conduct, *see supra* section IA, such that cumulative impeachment evidence against Coffaro and Groeger does not undermine our confidence in the outcome of the trial.

Finally, we reject the Amiels' contention that the government "permitted" Wallace to perjure himself on the stand. Defendants claim that the government "allowed Wallace to convey to the jury, with impunity, that his criminal activity was limited to that which he discussed on direct examination and that he had, in effect, 'come clean.'" However, the Amiels' references to the trial transcript do not support this contention. Wallace explained to the jury that he had pleaded guilty to mail fraud, but nowhere did he state that he had never committed another crime. Insofar as the Amiels claim that the government knowingly permitted the introduction of false testimony, we reject their claim as unsupported by the evidence.

## C. Double Jeopardy

■ The next issue in this case is whether, in light of the earlier civil forfeiture action brought against the Amiels' property, their criminal prosecution constituted a second punishment in violation of the double jeopardy clause of the Fifth Amendment.

The Supreme Court has recently resolved this issue in favor of the government. In *United States v. Ursery,* —— U.S. ——, 116 S.Ct. 2135, 135 L.Ed.2d 549 (1996) the Court held that in rem civil forfeitures (such as those brought under 18 U.S.C. § 981) are neither "punishment" nor criminal for purposes of the Double Jeopardy Clause. *Id.* at ——, 116 S.Ct. at 2149. In light of this decision, the Amiels' have not been subjected to former jeopardy. Therefore, their double jeopardy claims are meritless.

## D. Judge's Comments to Defense Counsel

■ Sarina Amiel claims that she was denied a fair trial because the court re-

peatedly denigrated her attorney in the presence of the jury. This court should only reverse Sarina's conviction based on Judge Platt's conduct if "the judge's behavior was so prejudicial that it denied [Sarina Amiel] a fair, as opposed to a perfect, trail." *United States v. Robinson,* 635 F.2d 981, 984 (2d Cir.1980), *cert. denied,* 451 U.S. 992, 101 S.Ct. 2333, 68 L.Ed.2d 852 (1981). The court's role is not to determine "whether the trial judge's conduct left something to be desired, or even whether some comments would have been better left unsaid." *United States v. Pisani,* 773 F.2d 397, 402 (2d Cir. 1985). The test is whether the jury was so impressed with the judge's partiality to the prosecution that it became a factor in determining the defendant's guilt, *id.,* or whether "it appear[ed] clear to the jury that the court believe[d] the accused is guilty." *United States v. Nazzaro,* 472 F.2d 302, 303 (2d Cir.1973).

■ We have reviewed the record, and have concluded that many of the instances reported in Sarina Amiel's brief reveal only that Judge Platt became justifiably frustrated with the misleading tactics of her mother's and aunt's defense attorneys.[8] These comments hardly provide ground for reversal. *See Pisani,* 773 F.2d at 403–04 ("At least some of [the trial judge's] comments were provoked by counsel's continuing to do things that the court had specifically cautioned him to avoid, a factor that properly may be taken into account to determine whether defendant was prejudiced."). Thus, this final claim for relief is also rejected.

## III. CONCLUSION

We have considered all of appellants' arguments, and find them to be without merit. The judgment of the district court is affirmed.

---

8. Not one of the improper comments Sarina complains about was directed at her attorney. Rather, they were directed at her mother's attorney and her aunt's attorney.