UNITED STATES of America,
Appellee,

v.

Seynabou SECK, Defendant–Appellant.

Docket No. 01–1307.

United States Court of Appeals,
Second Circuit.

Oct. 23, 2002.

Eric B. Bruce, Assistant United States Attorney (James B. Comey, United States Attorney, on the brief; Michael S. Kim and Meir Feder, Assistant United States Attorneys, of counsel), Southern District of New York, New York, NY, for Appellee.

Edward S. Zas, Legal Aid Society, Federal Defender Division, New York, NY, for Defendant–Appellant.

Present OAKES, STRAUB, Circuit Judges, and PRESKA, Judge.*

---

* The Honorable Loretta A. Preska, United States District Judge for the Southern District of New York, sitting by designation.

## SUMMARY ORDER

AFTER ARGUMENT AND UPON DUE CONSIDERATION, IT IS HEREBY ORDERED, ADJUDGED AND DECREED that the judgment of the District Court is hereby **AFFIRMED.**

Seynabou Seck appeals from the June 6, 2001 judgment of the United States District Court for the Southern District of New York (Richard Conway Casey, *Judge*) convicting her, following a jury trial, on two counts of credit card fraud and one count of conspiracy to commit credit card fraud in violation of Title 18, United States Code, Sections 1029(a)(2), 1029(a)(3) and 371. We affirm.

### I.

The indictment charged Seck with participating in a fraudulent scheme in which stolen credit card numbers were used to purchase over $212,000 in credits for use with prepaid telephone calling cards. Specifically, Count One of the indictment charged Seck with conspiring to commit credit card fraud in violation of 18 U.S.C. § 371. Count Two charged Seck with unlawfully trafficking in and using credit card account numbers in violation of 18 U.S.C. § 1029(a)(2). Count Three charged Seck with unlawfully possessing fifteen or more credit card numbers in violation of 18 U.S.C. § 1029(a)(3).

At trial, the government's evidence included computer records revealing that some 4,566 fraudulent purchases of prepaid calling card credits had been conducted over telephone lines installed in Seck's apartment; telephone records demonstrating that Seck's apartment had approximately fifteen different phone lines established under eight different identi-

ties; testimony by the superintendent in Seck's building that Seck had attempted to bribe him if he permitted her to install a telephone line on the telephone box in the building's basement; documents seized from Seck's apartment that contained stolen credit card account numbers and bore Seck's fingerprints; eighty-four prepaid calling cards seized from Seck's apartment; receipts for over six-hundred dollars' worth of prepaid calling cards; and the testimony of Mamadou Diallo, a cooperating witness who testified that Seck had enlisted Diallo's assistance in procuring stolen credit card numbers and that Seck had come to Diallo's apartment asking that he hide for her a suitcase filled with credit card receipts and prepaid calling cards.

Seck testified in her own defense and denied participating in the fraudulent scheme. Seck claimed that she was away from her apartment on business for extended periods of time, that an individual named "Babacar" had also lived in Seck's apartment during the relevant period, and that Babacar carried out the scheme in her apartment without her knowledge.

On July 26, 2000, following a twelve-day trial, the jury convicted Seck on all counts. On June 5, 2001, the District Court sentenced Seck to forty months' imprisonment, three years' supervised release, and a special assessment. This timely appeal followed.

## II.

On appeal, Seck contends that four events undermined the overall fairness of her trial and that, as a result, this court should vacate her conviction and remand for a new trial. We conclude that none of these factors, either alone or in conjunction, is a sufficient ground for reversal. And even were we to ascribe error to the District Court in any given instance, which

we do not, such error would be harmless in light of the overwhelming evidence of Seck's guilt.

### A. *The District Court's Questioning of Seck*

■ At the conclusion of Seck's testimony, the following colloquy between the District Court and Seck took place before the jury:

The Court: You're both finished?

Def. Counsel: Yes, your Honor.

The Court: Ms. Seck, remain on the stand for a moment. I have a couple of questions for you. Ms. Seck, on Friday, I believe you testified that on July 10th, 1999 you received a call informing you that your stepmother had died. Is that correct?

Seck: Yes.

The Court: Did some relative from Senegal call you to give you that sad news?

Seck: It was my mother who called me.

The Court: From Senegal?

Seck: Yes.

The Court: I believe you testified the next day, on July 11th, prayers were said in your apartment for your deceased stepmother. Is that correct?

Seck: Yes.

The Court: Now, I believe you acknowledged earlier that your phone had been cut off, meaning there was no phone service as of June 12th, 1999. Is that correct?

Seck: Yes.

The Court: Now, with your phone cut off, how did your mother know what phone number to call you on at your home?

Seck: She called me on Babacar's phone?

The Court: Yes, but who told her that phone number that she could use to reach you?

Seck: When my phone was cut off, I gave them that number in case of emergencies.

The Court: I believe earlier than last Friday, it was your testimony, you said that you have Mr. Torres, the building supervisor, $100 for helping you carry some merchandise out of the building. Do you remember that?

Seck: Yes.

The Court: When did that occur?

Seck: I think, I think that it was in the month of June, but I don't remember the date.

The Court: And this was for helping you carry out merchandise that belonged to some other person. Is that correct?

Seck: Yes.

The Court: At the same time that you gave him this tip, did you owe the money to Bellevue Hospital you testified about earlier?

Seck: Bellevue Hospital was when I left prison and when I was sick.

The Court: I thought you testified on Friday that as of the summer of 1999 that you owed money to Bellevue Hospital. Isn't that correct?

Seck: Yes, I left her in September of 1999.

The Court: My question was: As of June of 1999, did you owe money to Bellevue Hospital?

Seck: I know that I owe money to Bellevue Hospital, but I don't remember the date.

The Court: In June of 1999, were you already in arrears for your rent for your apartment?

Seck: Yes, but I was paying on it.

The Court: No further questions, Ms. Seck. You may step down.

Tr. 1107–09. Perceiving the District Court's questioning as evincing "incredulity" and "doubt" as to Seck's testimony, counsel for Seck immediately moved for a mistrial. The District Court denied the motion and explained that its questions were necessary for the purpose of clarifying the record for the jury's benefit.

In determining whether a trial judge's conduct has deprived the defendant of a fair trial, we must "examine the entire record and attempt to determine whether the conduct of the trial judge has been such that the jurors have been impressed with the trial judge's partiality to one side to the point that this became a factor in the determination of the jury." *United States v. Guglielmini,* 384 F.2d 602, 605 (2d Cir.1967). At the same time, Federal Rule of Evidence 614(b) explicitly provides that "[t]he Court may interrogate witnesses, whether called by itself or a party." We have thus held that a trial judge is permitted to ask questions of witnesses in order to clarify ambiguities, correct misstatements, or obtain information necessary to make rulings. *See United States v. Manko,* 979 F.2d 900, 905 (2d Cir.1992), *cert. denied,* 509 U.S. 903, 113 S.Ct. 2993, 125 L.Ed.2d 687 (1993).

While it is true that most of the District Court's questions to Seck were framed in leading language, we think that the questions neither amounted to nor smacked of prosecutorial cross-examination. Rather, the District Court appropriately sought to clarify factual ambiguities that had arisen in the course of a complex criminal trial, and once such ambiguities were cleared, the District Court promptly ceased its line of questioning. That the District Court's inquiries touched upon significant issues is not, by itself, dispositive; if anything, confusion that afflicts a significant trial issue

is more, not less, deserving of clarification by the trial judge. We are also mindful that the entirety of Seck's testimony lasted three days and comprised some 213 pages in the record, that the District Court's questions comprised three pages, and that, prior to the jury's deliberation, the District Court charged the jury that "nothing I have said during the course of the trial should be considered by you as indicating that I have any opinion as to the facts or what your verdict should be." Tr. at 1243–44. In sum, having reviewed the trial transcript, we do not think that the District Court's questioning of Seck, as a whole, conveyed to the jury the impression that the court disbelieved the defendant's testimony.

B. *The District Court's Comments to Defense Counsel*

■ Seck also challenges her conviction on the basis of the District Court's criticisms, before the jury, of defense counsel. The District Court admonished defense counsel for various reasons, the most significant of which was counsel's repeated "telegraphing" of answers to Seck during the government's cross-examination of Seck. We have held that because a trial judge is to be given wide latitude in maintaining control over trial proceedings, our role on appeal "is not to determine whether the trial judge's conduct left something to be desired, or even whether some comments would have been better left unsaid." *United States v. Amiel*, 95 F.3d 135, 146 (2d Cir.1996) (internal quotation marks omitted). Instead, reversal of conviction is warranted only if "the jury was so impressed with the judge's partiality to the prosecution that it became a factor in determining the defendant's guilt, or [if] it appear[ed] clear to the jury that the court believe[d] the accused is guilty." *Id.* (internal quotation marks and citation omitted).

We do not believe that the District Court's comments to defense counsel warrant a new trial given that defense counsel persisted in telegraphing answers to Seck despite repeated warnings against doing so by the District Court at side bar, *see United States v. Robinson*, 635 F.2d 981, 984 (2d Cir.1980), *cert. denied*, 451 U.S. 992, 101 S.Ct. 2333, 68 L.Ed.2d 852 (1981), given that the District Court's criticisms of defense counsel constituted only a brief part of a lengthy trial and were otherwise quite limited, *see United States v. Pisani*, 773 F.2d 397, 404 (2d Cir.1985), and given that the District Court's admonishments were directed at counsel's trial conduct rather than the underlying merits of Seck's innocence defense, *see United States v. DiTommaso*, 817 F.2d 201, 220 (2d Cir.1987).

C. *The Government's Summation*

Seck argues on appeal that during summation the government should not have accused her of perjury, should not have appealed to jury sympathy by discussing the harm ostensibly suffered by Seck's victims, and should not have described defense counsel as having erected "smokescreens" during the course of the trial. None of these objections requires reversal.

■ We have held that "[u]se of the words 'liar' or 'lie' to characterize disputed testimony when the witness's credibility is clearly in issue is ordinarily not improper unless such use is excessive or is likely to be inflammatory." *United States v. Peterson*, 808 F.2d 969, 977 (2d Cir.1987). Here, the government's suggestion to the jury that Seck had lied on the stand was not unreasonable, especially in light of the evidence that contradicted Seck's sworn testimony. That the government used the term "perjury" rather than "lie" is, in our view, not significant.

■ As for the government's alleged appeals to the jury's sympathy, Seck points to statements by the government describing its prosecution of Seck as "important" and describing Seck's fraud as being "a complete drain on society in terms of the number of man-hours it took ... to sift through all of the defendant's fraud and correct it." Tr. 1189–90. These comments, however, were fair responses to the defendant's attempts to characterize her prosecution as vindictive, thereby impugning the government's integrity. *See United States v. Feliciano*, 223 F.3d 102, 123 (2d Cir.2000), *cert. denied*, 532 U.S. 943, 121 S.Ct. 1405, 149 L.Ed.2d 348 (2001).

■ Lastly, we do not agree with Seck's characterization of the government's "smokescreens" comment as "unfairly pitt[ing] government counsel as white knights searching for the truth versus an unscrupulous defense lawyer who was wasting the jury's time and trying to hide the truth." Def. Br. at 58. As above, this isolated comment was justified in light of defense counsel's claims of prosecutorial vindictiveness. *See United States v. Rivera*, 971 F.2d 876, 883 (2d Cir.1992).

## D. *Diallo's Perjury*

■ During his direct examination at Seck's trial, Mamadou Diallo testified that he was unable to read or write in any language. On cross-examination, however, Diallo admitted that he had passed a written examination before receiving his New York state driver's license but that he had passed the examination, not because he really was literate, but "because Allah gave me luck to go through with it." Tr. at 910. Five months after the conclusion of Seck's trial, the government confronted Diallo about his testimony regarding his driver's license. Diallo admitted that he had paid someone fifty dollars to help him

pass the exam. This information was thereafter disclosed to defense counsel.

On December 13, 1999, defense counsel moved to vacate Seck's conviction on the ground that Diallo's admission constituted "newly discovered evidence" that warranted a new trial. The District Court denied Seck's motion because it found that the government did not know of Diallo's perjury, and that, even if the government did know, there was sufficient independent evidence to support Seck's conviction. The court additionally found that Diallo's perjury was in reference to a collateral matter and that Diallo's credibility had been thoroughly undermined by defense counsel during cross-examination and summation.

Where a new trial is sought based on perjury by a government witness of which the government knew or should have known, a new trial is warranted only if " 'there is any reasonable likelihood that the false testimony could have affected the judgment of the jury.' " *United States v. Wong*, 78 F.3d 73, 81 (2d Cir.1996) (quoting *United States v. Wallach*, 935 F.2d 445, 456 (2d Cir.1991), *cert. denied*, 508 U.S. 939, 113 S.Ct. 2414, 124 L.Ed.2d 637 (1993)). But "where independent evidence supports a defendant's conviction, the subsequent discovery that a witness's testimony at trial was perjured will not warrant a new trial." *Wong*, 78 F.3d at 82. A district court's decision on a new trial motion will not be reversed on appeal absent an abuse of discretion, *see United States v. Torres*, 128 F.3d 38, 48 (2d Cir.1997), *cert. denied sub nom, Rivera v. United States*, 523 U.S. 1065, 118 S.Ct. 1399, 140 L.Ed.2d 657 (1998), and all findings of fact made by the district court in resolving the motion are accepted on appeal unless clearly erroneous, *see United States v. Gallego*, 191 F.3d 156, 161 (2d Cir.1999), *cert. denied*, 530 U.S. 1216, 120 S.Ct. 2220, 147 L.Ed.2d 252 (2000).

Although the government has effectively admitted on appeal that it was aware of Diallo's perjury at the time of his cross-examination, and although we agree that the government would have been better off had it confronted Diallo promptly, we nonetheless conclude that the District Court did not abuse its discretion in denying the motion for a new trial.[1] First, the matter of Diallo's driver's license was collateral and, in any event, would not have served further to undermine Diallo's credibility to any appreciable degree. Second, even without Diallo's testimony, there existed overwhelming evidence of Seck's guilt, including but not limited to telephone records indicating that fifteen different phone lines had been installed in Seck's apartment within a span of thirteen months, computer records that fraudulent activity had occurred over those lines, testimony from Seck's superintendent that Seck had attempted to bribe him if he permitted Seck to install a phone line in the building's basement, and documents recovered from Seck's apartment containing stolen credit card numbers and bearing Seck's fingerprints.

*United States v. Wallach,* 935 F.2d 445 (2d Cir.1991), *cert. denied,* 508 U.S. 939, 113 S.Ct. 2414, 124 L.Ed.2d 637 (1993), is distinguishable because Diallo's credibility had already been thoroughly undermined at trial and because the government made no attempt to rehabilitate Diallo after cross-examination. And while the government stated on summation that Diallo's testimony could be corroborated, the government was speaking only in terms of the testimony that related to Seck's guilt and that could be independently corroborated by other government evidence. Indeed, the government readily admitted to the jury that Diallo "is a criminal and . . . has been prosecuted by the government." Tr. at 1165.

### III.

After carefully considering all of Seck's contentions on appeal, the judgment of the District Court is hereby **AFFIRMED.**

---

1. We also find that the District Court did not abuse its discretion in refusing to conduct an evidentiary hearing on the perjury matter.

*See United States v. Sasso,* 59 F.3d 341, 350 (2d Cir.1995).